******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
GREGORY L. WEATHERS
(SC 20297)

Palmer, McDonald, D'Auria, Ecker and Vertefeuille, Js.*

*Syllabus*

Convicted, after a trial to a three judge panel, of the crimes of murder, criminal possession of a pistol or revolver, and carrying a pistol without a permit in connection with the shooting death of the victim, the defendant appealed. The defendant had approached the victim, who was working at a construction site, to ask whether the construction company was hiring new employees. One of the victim's coworkers suggested that the defendant go to the company's office to fill out a job application. The defendant appeared to walk away but, shortly thereafter, again approached the victim and shot and killed him. At trial, the defendant raised the affirmative defense of mental disease or defect under the applicable statute ((Rev. to 2015) § 53a-13 (a)), claiming that he lacked substantial capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law. According to the defendant, on the morning of the offense, he experienced auditory hallucinations and delusions that influenced his thinking and behavior. These included hearing voices and seeing flashing lights, which indicated to the defendant that the victim was dangerous and that he should be shot. The defendant presented the testimony of two expert witnesses, both of whom opined that the defendant's mental condition impaired his ability to control his conduct within the requirements of the law. The trial court, however, found that the state had met its burden of proof on the counts charged and that, although the defendant demonstrated that he suffered from an unspecified psychotic disorder at the time of the murder, he failed to prove his affirmative defense because he did not demonstrate the requisite connection between his condition and his criminal conduct. The Appellate Court upheld the defendant's conviction, and the defendant, on the granting of certification, appealed to this court. *Held* that the Appellate Court correctly concluded that the trial court had reasonably rejected the defendant's defense of mental disease or defect and the opinions of the defense experts related thereto: although the state did not present any rebuttal experts, the trial court was not bound to accept the opinions of the defense experts relating to the defendant's mental disease or defect, as long as the court's rejection of such testimony was not arbitrary; moreover, the trial court's principal findings in support of its determination that the defendant had not met his burden of proving the defense of mental disease or defect were largely related, were supported by the record, and provided a reasonable basis for that determination, as the defendant's conduct immediately following the shooting did not reflect an inability to control his conduct, the defendant's motivation for shooting the victim was not borne out of psychosis but out of frustration and anger, which was exacerbated by anxiety and stress relating to the situation, the testimony of the defendant's experts and their reports reflected considerable divergence in the bases for their opinions, and the trial court's determination that the defendant was malingering by exaggerating or fabricating symptoms was supported by the facts, including that the defendant had no prior history of mental health treatment other than for substance abuse, and the defendant never told anyone, prior to the shooting, that he had been experiencing hallucinations; furthermore, although it was undisputed that the defendant suffered from some form of psychosis at the time of the offense, the fact that the defendant violated the law did not prove that his psychosis substantially impaired his ability to conform his conduct to the requirements of the law.

Argued May 8, 2020—officially released May 28, 2021**

*Procedural History*

Information charging the defendant with the crimes

of murder, criminal possession of a firearm, stealing a firearm, and carrying a pistol or revolver without a permit, brought to the Superior Court in the judicial district of Fairfield and tried to a three judge court, *Kavanewsky, E. Richards* and *Pavia, Js.*; thereafter, the state entered a nolle prosequi as to the charge of stealing a firearm; finding and judgment of guilty, from which the defendant appealed to this court, which transferred the appeal to the Appellate Court, *Keller, Prescott* and *Harper, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Dina S. Fisher*, assigned counsel, for the appellant (defendant).

*Timothy F. Costello*, senior assistant state's attorney, with whom, on the brief, were *John C. Smriga*, former state's attorney, and *Emily Dewey Trudeau*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. Following his election of and trial to a three judge court empaneled in accordance with General Statutes § 54-82 (a) and (b), the defendant, Gregory L. Weathers, was found guilty of murder in violation of General Statutes § 53a-54a (a), criminal possession of a pistol or revolver in violation of General Statutes (Rev. to 2015) § 53a-217c (a) (1), and carrying a pistol without a permit in violation of General Statutes (Rev. to 2015) § 29-35 (a). In so finding, the trial court rejected the defendant's affirmative defense of mental disease or defect under General Statutes (Rev. to 2015) § 53a-13 (a)[1] (insanity defense), concluding that, although the defendant demonstrated that he suffered from an unspecified psychotic disorder at the time of the murder, he failed to prove the requisite connection between this condition and his criminal conduct. The trial court rendered judgment accordingly and sentenced the defendant to a total effective term of imprisonment of forty-five years. On appeal, the Appellate Court affirmed the judgment of conviction; see *State* v. *Weathers*, 188 Conn. App. 600, 635, 205 A.3d 614 (2019); and we granted the defendant's petition for certification to appeal, limited to the issue of whether the Appellate Court correctly concluded that the trial court's rejection of the defendant's insanity defense was reasonable. See *State* v. *Weathers*, 331 Conn. 927, 207 A.3d 518 (2019). The defendant claims that the state neither presented nor elicited evidence to undermine the consensus of his experts that the defendant, as the result of a mental disease, lacked substantial capacity to control his conduct within the requirements of the law, and, therefore, the trial court improperly rejected the experts' opinions arbitrarily. He contends that the Appellate Court's conclusion to the contrary was not supported by legitimate reasons or evidence. We affirm the Appellate Court's judgment.

I

Because of the fact intensive nature of the evidentiary insufficiency claim raised by the defendant on appeal, we, like the Appellate Court, find it necessary to set forth the evidence adduced at trial in considerable detail. We begin with the Appellate Court's recitation of the facts that the trial court reasonably could have found in support of the judgment of conviction, which we have supplemented with additional relevant facts and procedural history. "On the morning of March 26, 2015, the victim, Jose Araujo, and several other individuals employed by Burns Construction were [in the process of backfilling a trench that had been dug along the side of the road for purposes of] installing an underground gas main on Pond Street in [the city of] Bridgeport. . . . Matthew Girdzis, one of the crew members, was seated in a dump truck positioned near the trench. The victim was standing on the driver's side of the

truck, speaking with Girdzis . . . .

"While the victim and Girdzis were talking, the defendant walked into the work zone and approached the victim. Girdzis had never seen the defendant there before; he was not an employee of Burns Construction. The defendant greeted the victim with a seemingly amicable 'fist bump' and asked the victim whether the construction company was hiring. The victim, in turn, relayed the question to Girdzis. Speaking to the defendant directly, Girdzis suggested that he go to the construction company's office . . . to fill out an application and 'see what happens.' By all accounts, there was nothing unusual or remarkable about the defendant's demeanor during his initial interaction with the victim and Girdzis. There was nothing to suggest that . . . the defendant harbored any animosity toward the victim or Girdzis. The defendant did not appear to be acting strangely; he appeared to be rational and to understand what was being said. [As one of the construction workers observed, however, the defendant kept his right hand in his pocket throughout the encounter.]

"Following this encounter, the defendant walked away, seemingly leaving the work zone, but, in fact, he merely walked around to the other side of the truck and stood near the passenger side door. Meanwhile, Girdzis and the victim had begun walking toward the trench. After a few seconds, the defendant looked up and down the street and, seeing the street empty, proceeded to walk back around the truck and reapproach the victim.[2] In a matter of seconds, the defendant, without saying a word, removed a revolver from his pocket and shot the victim several times. The victim ultimately died from gunshot wounds.

"Immediately after the shooting, the defendant began running up the street, zigzagging across it several times. Several of the victim's coworkers chased the defendant on foot. The defendant, seeing that he was being pursued, stopped momentarily at a parked pickup truck and opened its door but then quickly shut it again and resumed running up the street. The coworkers continued chasing the defendant until he ran in between two houses.

"Members of the Bridgeport Police Department soon arrived on the scene and began canvassing the area. The defendant eventually was located by Officer Darryl Wilson, who found the defendant hiding in some tall bushes in a backyard. Wilson ordered the defendant to show his hands, at which point the defendant began to run. Wilson ordered the defendant to stop and again demanded that he show his hands. The defendant complied. Upon observing the revolver in the defendant's hand, Wilson ordered the defendant . . . to drop the weapon and warned the defendant that he was prepared to shoot if the defendant did not comply. After [Wilson] repeat[ed] this order, the defendant dropped his

weapon. Additional police units arrived a few seconds later, and the defendant was arrested. As he was being arrested, the defendant mumbled something to the effect of, 'it's all messed up' or 'I messed up.'

"Following his arrest, the defendant was led out from behind the house and into the street, at which point Lieutenant Christopher LaMaine heard the defendant state spontaneously that he had been involved in a 'labor dispute.' When approached by LaMaine, the defendant again claimed that there had been a 'labor dispute.' After advising the defendant of his constitutional rights, which the defendant waived, LaMaine questioned him. The defendant seemed to have difficulty focusing, putting his thoughts together, and answering LaMaine's questions fully, and, at times, he rambled on incoherently, causing LaMaine to suspect that the defendant either had a mental illness or was under the influence of phencyclidine (PCP). Upon further questioning, the defendant stated that the victim was a foreman and was not 'letting anyone out here work' and that he had shot the victim to settle this dispute.

"[Thereafter] [t]he defendant . . . was transported to the police station, where he was interviewed by Detective Paul Ortiz and another detective. As Ortiz observed, there were numerous instances throughout the interview [when] the defendant either entirely failed to respond to questions or gave less than responsive answers, [which was not an uncommon occurrence during an interrogation, but] some of his statements seemed disorganized. [A couple of times during the interview, the defendant said that he was 'going crazy,' and, at the end of the interview, said 'I need help.'] Given his interactions with the defendant, Ortiz thought it was appropriate to have him evaluated at a hospital for possible mental health or drug problems.[3] Nevertheless, the defendant appeared to understand the detectives' questions.[4] He admitted to shooting the victim and expressed remorse for it. He stated that he had been looking for a job and felt that the victim had 'brushed [him] off.' [He stated that he had not been employed 'for a long time,' more than one year, and that he needed to feed his family. His response to a question asking why he had shot the victim was, 'I'm not working.' When asked what the victim had done to make the defendant so angry, he responded: 'Just . . . going through stress. I just can't take it anymore. Been rough. Trying to find work. Sorry.'] Following the interview, the defendant was transported to Bridgeport Hospital for evaluation and, the next day, was remanded to the custody of the Commissioner of Correction [where he received further psychiatric evaluation]." (Footnotes added; footnotes omitted.) *State* v. *Weathers*, supra, 188 Conn. App. 603–607.

The defendant subsequently raised the affirmative defense of insanity under § 53a-13 (a), claiming that he

met both the volitional prong and the cognitive prong of that defense. "Under the cognitive prong [of the insanity defense], a person is considered legally insane if, as a result of mental disease or defect, he lacks substantial capacity . . . to appreciate the . . . [wrongfulness] of his conduct. . . . Under the volitional prong, a person also would be considered legally insane if he lacks substantial capacity . . . to conform his conduct to the requirements of law." (Internal quotation marks omitted.) *State* v. *Madigosky*, 291 Conn. 28, 39, 966 A.2d 730 (2009).

"In support of his affirmative defense, the defendant presented the testimony of two expert witnesses, David Lovejoy and Paul Amble, both of whom produced written evaluations that were admitted into evidence. Lovejoy, a board certified neuropsychologist hired by the defense, examined the defendant on three separate occasions in July, September, and November, 2015. Lovejoy also reviewed [records from Bridgeport Hospital and the Department of Correction and police reports], conducted interviews with the defendant's wife and two of his friends, and watched the video recording of the police interview.

"According to Lovejoy, the defendant and his wife reported that, in the two years leading up to the offense, the defendant had been experiencing multiple, ongoing stressors. Lovejoy's evaluation revealed that the defendant had lost his job as a truck driver in 2013 and that he had remained unemployed thereafter, despite continuing efforts to secure employment. Following the loss of his job, the defendant began drinking heavily, which resulted in criminal charges for operating a motor vehicle while under the influence of intoxicating liquor or drugs. In January, 2015, the defendant, aware that there was a warrant out for his arrest in connection with these charges, turned himself in to authorities. The defendant remained in prison until his wife was able to secure a bail bond in March, 2015—shortly before the offense in question took place. According to the defendant's representations to Lovejoy, after his release from prison, he began to worry about his family's finances and, over time, started to 'feel crazy' and experience thoughts of suicide. . . .

"According to Lovejoy, '[i]nformation collected during the clinical interviews with [the defendant] and the collateral interviews with his wife and friends indicated that [the defendant] began to decompensate psychiatrically, beginning on [March 22 or 23, 2015]. Strange behaviors, disrupted sleep, ruminative pacing, tangential and confused thinking, and moments of appearing "spaced out" were observed by those who were with him.' The defendant's wife also indicated to Lovejoy that [on one occasion] . . . the defendant . . . espouse[d] paranoid thoughts related to a belief that she wanted to hurt or kill him.

"Regarding the defendant's conduct and state of mind later that week, Lovejoy's interviews with the defendant revealed that, '[b]y the evening [before and/or morning of the offense, the defendant] appeared to be under the influence of strong beliefs that were not based in reality (delusions).' More specifically, the defendant reported to Lovejoy that he had begun to believe that he was receiving messages via flashing lights emanating [from] his computer screen [and television]. In Lovejoy's view, '[t]hese beliefs had become a prominent part of [the defendant's] clinical presentation, at that time.' The defendant also reported to Lovejoy that he had begun to hear voices that made critical comments about him. He described these voices as sounding like 'me talking to myself from the inside.' . . . The defendant further represented to Lovejoy that, by the night before the offense, he had resolved to kill himself because he 'was tired of trying to get [his] thoughts together and . . . wanted the voices to go away,' but he decided against doing it at that time because he did not want his wife and daughter to have to find his body in the house. . . .

"Lovejoy's interviews with the defendant further revealed that, by the morning of the offense, 'auditory hallucinations, delusions and suicidal thinking were present and appeared to be overarching influences on [the defendant's] thinking and behavior.' More specifically, the defendant reported to Lovejoy that, on the morning of the offense, he believed that the flashing lights from his computer screen were sending him a message indicating, '[g]et your gun. You are worthless, and others are evil.' . . . The defendant reported that the message also had indicated that he would receive additional messages from lights outside of his home. The defendant reported that, by this point, he had decided to kill himself at a local cemetery. He further reported, however, that he came upon a construction site displaying a range of colored lights that were flashing at him and that these lights and the voices inside of him told him to stop. According to the defendant, a person at the construction site fixed his eyes on him and then looked to another man with 'an evil intent,' at which time the lights conveyed to the defendant that this person was dangerous and that he should shoot him." (Footnote omitted.) *State* v. *Weathers*, supra, 188 Conn. App. 611–14.

"In addition to interviewing the defendant and collateral sources, Lovejoy also reviewed the defendant's medical records from after the offense. Regarding the defendant's Bridgeport Hospital records, which were admitted into evidence at trial, Lovejoy noted that mental health experts there had diagnosed him with 'psychosis not otherwise specified' and that his Global Assessment of Functioning score indicated 'the presence of very severe psychiatric symptoms and associated functional impairments.'[5] Lovejoy further noted that the hos-

pital records described a number of symptoms consistent with a thought disorder, including tangential thinking, thought blocking, confused and disorganized thinking, the inaccurate interpretation of reality, suspicious and paranoid thinking, difficulty following conversations and responding to questions, a poverty of speech, and impaired impulse control. The defendant also was observed to be internally preoccupied and staring suspiciously. Regarding the defendant's medical records from the Department of Correction . . . Lovejoy testified that they were largely, but not entirely, consistent with the hospital records. Lovejoy testified that, early on in the defendant's treatment at the department, a psychiatrist, Allison Downer, had suspected that the defendant may have been exaggerating or fabricating his mental health symptoms.[6] Lovejoy surmised, however, that Downer likely had not reviewed the defendant's hospital records or conducted any collateral interviews.

"Finally, as part of his evaluation, Lovejoy also conducted psychological and neuropsychological testing on the defendant. Lovejoy testified that this testing gave no indication that the defendant had been exaggerating his cognitive complaints or had been attempting to fabricate or exaggerate his psychiatric symptoms [at the time testing was undertaken]. According to Lovejoy, the testing revealed the presence of likely delusions, auditory hallucinations, and a tendency to experience confused thinking, which was consistent with the defendant's self-report of his psychological and psychiatric symptoms.

"On the basis of the foregoing information, Lovejoy testified that his overall opinion was that, at the time of the offense, the defendant had been suffering from a psychotic disturbance that significantly influenced his thinking and behavior, although he was not able to arrive at any specific diagnosis for the defendant.[7] Although he did not opine in his written evaluation as to whether this psychotic disturbance had impacted the defendant's ability to conform his conduct to the law, upon questioning by defense counsel, Lovejoy testified that the defendant's 'psychotic disorder did impact him in that way.' " (Footnotes added; footnote in original; footnote omitted.) Id., 614–15.

"Amble, a board certified forensic psychiatrist hired by the state, also testified for the defense. Amble evaluated the defendant for three and one-half hours in April, 2016. Amble reviewed the same reports, records, and video recording reviewed by Lovejoy and interviewed the same collateral sources. He also reviewed Lovejoy's written evaluation.

"Amble testified that the information he obtained during his interviews with the collateral sources was consistent with that reported by Lovejoy. The defendant's account of his symptoms and the circumstances

surrounding the offense, as reported in Amble's written evaluation, were also generally consistent with that provided to Lovejoy, but it also included some additional information. Regarding his auditory hallucinations, the defendant reported to Amble that he had first begun to hear voices while still incarcerated on the operating a motor vehicle while under the influence charges. He also reported that these voices had indicated to him on multiple occasions that he should kill himself, and, on the morning of the offense, he heard his own voice confirming the plan. The defendant further reported that, in addition to the auditory hallucinations, he also had experienced visual hallucinations in the form of his deceased father. . . . [U]pon questioning by Amble as to what exactly had prompted him to shoot the victim, the defendant reported that, at the time of the offense, he [believed that he was] possessed by a demon and that, afterward, he had continued to be possessed until 'people in jail prayed over [him] and release[d] the demon.' . . .

"On the basis of his review of the records, Amble concluded that the [Department of Correction's] diagnosis of psychosis not otherwise specified was reasonable, although he was likewise unable to make his own diagnosis.[8] As to the defendant's insanity defense, Amble [opined that, at the time of the incident, the defendant appreciated the wrongfulness of his conduct—the defendant conceded as much in his interview—but] 'had some impairments in his ability to conform his conduct to the law.' As Amble explained in more detail in his written evaluation, however, there were several pieces of countervailing information that militated against the veracity of the defendant's claim of insanity.

"First, Amble noted that the defendant had failed to share with anyone, including Lovejoy, that he was having severe visual hallucinations [of his father] and auditory hallucinations while incarcerated prior to the offense. Second, the defendant had never before claimed to have been possessed by a demon until after repeated questioning by Amble. . . . Third, the mental health evaluations by Downer at the [D]epartment [of Correction] drew clear conclusions that the defendant was fabricating symptoms of a mental illness [although this view was not shared by other department psychiatric staff]. Fourth, the defendant's account of his symptoms was not typical for individuals with a psychotic illness. Specifically, Amble stated that it was atypical for an individual to experience auditory hallucinations in one's own voice and to experience visual hallucinations as distinctive as those described by the defendant. [Amble opined that these four factors, taken together, strongly suggested the possibility that the defendant was embellishing his psychiatric symptoms.] Finally, Amble raised doubts about the claimed impulsivity of the shooting. He found it curious that, although the

defendant purportedly had experienced auditory hallucinations telling him to kill himself on numerous occasions [he had never attempted to do so] and [then, when he] had intended to do so on the day of the offense, the single hallucination at the construction site was enough to cause him to change his plans and [to] kill somebody else. [Amble hypothesized several possible explanations for the shooting but noted that the defendant had denied each scenario.][9]

"Ultimately, Amble [opined that the defendant appeared to be providing a 'malingered explanation' for why he had shot the victim but] concluded that, despite these countervailing considerations, 'the sum of the evidence, including reports of the defendant's [wife] and friends, the illogical nature of the act, the lack of primary gain, and mental health assessments immediately after the crime [indicating] that he was suffering from a psychiatric illness, provide[s] a sufficient basis to conclude that the defendant lacked substantial capacity to control his conduct at the time of his crime.' In response to questioning by the court, Amble clarified that his conclusion was '[t]o some extent based on [the defendant's own] report' but also noted that the collateral information was 'very important.' He also attributed moderate weight to what he described as the seemingly illogical, senseless nature of the shooting." (Footnotes added; footnote omitted.) Id, 615–18.

"In rebuttal to the defendant's insanity defense, the state relied [exclusively] on its cross-examination of the defendant's two experts and the evidence adduced in its case-in-chief. A significant portion of the state's cross-examinations was focused on the possibility that the defendant's mental state had been caused by the use of PCP or 'bath salts.'[10] See General Statutes [Rev. to 2015] § 53a-13 (b) ('[i]t shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance, or any combination thereof'). Nevertheless, the state also challenged the experts' conclusions regarding the defendant's ability to control his conduct. On cross-examination, Lovejoy conceded that not all people who suffer from psychotic symptoms lose the ability to control their conduct within the requirements of the law and that the majority of people who suffer from some sort of psychosis do not come into contact with the law. . . . Lovejoy acknowledged that it was 'difficult for [him] to separate conceptually in [his] head' the cognitive and volitional prongs [of the statutory insanity defense] because, '[f]or [him], the notion of understanding the wrongfulness of your action and the notion of being in control of your actions when you are separated from reality are somewhat intertwined . . . .' " (Footnote altered.) *State* v. *Weathers*, supra, 188 Conn. App. 618–19.

"Amble likewise conceded on cross-examination that a psychosis does not necessarily impair a person's ability to control his or her conduct within the requirements of the law and that the majority of people experiencing their first episode of psychosis do not commit violent acts. Amble further conceded that the fact that a crime is poorly thought out does not necessarily indicate that it is a product of psychosis. Similarly, Amble agreed that the fact that someone may have reacted violently to an apparently minor slight does not necessarily indicate that he was operating under the influence of a psychosis. Moreover, in response to questioning by the court, Amble agreed that people who act illogically and commit illogical acts are not necessarily unable to conform their behavior to the requirements of the law. He also acknowledged that there was some evidence that the defendant had 'mention[ed] something about a labor dispute at the time of his arrest' but stated that, from the information that Amble had, this 'didn't seem to make sense.' "[11] Id., 619–20.

In a unanimous oral decision, the trial court found that the state had met its burden of proof on the three counts charged[12] and that the defendant had failed to prove his affirmative defense. With respect to that defense, the court found that there was credible evidence that the defendant suffered from a mental disease or defect—a psychosis of an unspecific nature—at the time of the offense. The court further found, however, that the defendant had failed to meet his burden of proving that, as a result of this mental disease, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law. With regard to the latter, volitional prong—the only prong at issue on appeal—the court found that "the defendant's mental disease did not diminish his ability to conform his behavior. The defendant's actions in shooting [the victim] were not borne out of his psychosis. Simply put, he was acting out of frustration and anger. The defendant was faced with a multitude of stressful and emotional hurdles in his life not of a psychiatric nature, which motivated his actions that day. He had lost his job, he had not been able to gain employment for a substantial period of time . . . and was facing foreclosure on his home. . . . The evidence suggests that he made overtures for a job, and, when he was directed to make an application elsewhere, he felt rebuffed and, in his own words, felt that he had been brushed off." The court also pointed to the defendant's conduct immediately following the shooting, when confronted by the police near the scene and during the police interview, characterizing that conduct as compliant, unremarkable, and appropriate.

The trial court went on to explain why it had not found that the experts' opinions were sufficient to meet

the defendant's burden of proof. It first noted that, although there was agreement on some points, the experts' testimony and reports "show[ed] at least as much divergence as they do uniformity in the [bases] for their opinions." The court also observed that, although the experts did agree that the defendant was unable to conform his conduct to the requirements of the law, it could not agree with that conclusion for the reasons it had previously articulated. The court further explained that there was substantial, credible evidence that the defendant "was malingering and thus [found] that the defendant willingly either fabricated or embellished his symptoms selectively over time. . . . [T]he defendant had a perceived motivation, a reason to commit these crimes. The court's findings relating to his malingering . . . and his motivation [for] commit[ting] the crime . . . undermine the opinions of the [experts] that the defendant could not conform his conduct."

The defendant appealed to this court, and we transferred the appeal to the Appellate Court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Thereafter, the defendant sought an articulation from the trial court regarding the evidentiary basis on which each of the court's findings rested. The court denied the request, and the defendant did not seek review of that decision.

In his appeal to the Appellate Court, the defendant contended that (1) the trial court arbitrarily rejected the experts' opinions because there was no conflicting evidence on which to base such a conclusion; *State* v. *Weathers*, supra, 188 Conn. App. 620; and (2) certain of the court's findings were clearly erroneous, in particular, (a) the defendant shot the victim out of anger and frustration, (b) "there was nothing unremarkable, untoward or aberrant about the defendant's conduct [during the police interview]," and (c) the defendant fabricated or embellished his symptoms. (Internal quotation marks omitted.) Id., 626–27. In rejecting the first contention, the Appellate Court concluded, among other things, that the trial court was entitled to rely on its nonpsychiatric explanation for the defendant's conduct, and that it was reasonable for the trial court to conclude that the experts' opinions to the contrary were undermined by evidence that supported the trial court's finding that the defendant intentionally had either embellished or fabricated his psychiatric symptoms over time, especially in light of the experts' reliance on what the defendant himself had reported about his symptoms and the events surrounding the shooting. Id., 623–26. The Appellate Court identified particular facts on which each expert had relied or had failed to adequately consider as a reasonable basis for the trial court to have rejected the experts' opinions. See id., 624–26. The Appellate Court also identified evidence in the record that, in its view, supported the findings challenged by the defendant. Id., 627–33. Specifically

with respect to the fabrication or embellishment of symptoms, the Appellate Court reasoned: "Because the defendant concedes that there is some evidence of malingering in the record—namely, Downer's notation in the defendant's medical records with the [D]epartment [of Correction] and Amble's conclusion in his written evaluation—[the court] cannot conclude that the [trial] court's finding [with respect to this issue] is clearly erroneous." Id., 633. The Appellate Court affirmed the judgment of the trial court; id., 635; and this certified appeal followed.

## II

In his appeal to this court, the defendant contends that a trial court's discretion to reject expert opinion does not permit it to do so arbitrarily, and that the trial court's rejection of the unrebutted consensus of the only two experts to testify in the present case constituted precisely that. He contends that the Appellate Court's contrary conclusion rested on its improper endorsement of the trial court's irrelevant "motivation" theory and other considerations that did not legitimately undermine the experts' opinions.[13]

The state claims that the defendant's arguments are premised on an improper standard of review. It asserts that the question is not whether it was proper for the trier of fact to diverge from the experts' opinions given that the trier is free to reject such opinions; rather, it is whether there was sufficient evidence to support the trier's ultimate finding that the defendant's guilt had been proved beyond a reasonable doubt. The state contends that the record in the present case supports that finding.[14] It alternatively contends that, even if the proper standard requires us to consider whether the record contains a reasonable basis for rejecting the experts' opinions, that standard was met. We agree with the defendant's position as to the standard of review, insofar as it applies to expert testimony, but agree with the state that this standard was met in the present case.

Our review is governed by the following principles. Paramount among these is that, because insanity is an affirmative defense, the defendant bore the burden of proving by a preponderance of evidence that, as a result of his psychotic condition at the time of the offense, he "lacked substantial capacity, as a result of mental disease or defect . . . to control his conduct within the requirements of the law." General Statutes (Rev. to 2015) § 53a-13 (a); see also General Statutes § 53a-12 (b) ("[w]hen a defense declared to be an affirmative defense is raised at a trial, the defendant shall have the burden of establishing such defense by a preponderance of the evidence"). "Although this case presents an unusual procedural posture [insofar as] a [three judge] panel serves as the finder of facts (instead of a jury) and . . . the burden is on the defendant to prove his affirmative defense, the normal rules for appellate

review of factual determinations apply and the evidence must be given a construction most favorable to sustaining the court's verdict." *State* v. *Zdanis*, 182 Conn. 388, 391, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 207 (1981).

The defendant's appeal relies heavily on the fact that both of his experts opined that his mental condition impaired his ability to control his conduct within the requirements of the law, whereas the state presented no expert opinion. Undoubtedly, "[o]pinion testimony from psychiatrists, psychologists, and other [mental health] experts is central to a determination of insanity. . . . Through examinations, interviews, and other sources, these experts gather facts from which they draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior. . . . At trial, they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. . . . Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, [mental health] experts can identify the elusive and often deceptive symptoms of insanity and tell the [trier of fact] why their observations are relevant. . . . In short, their goal is to assist [fact finders], who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense." (Citations omitted; internal quotations marks omitted.) *Barcroft* v. *State*, 111 N.E.3d 997, 1003 (Ind. 2018), quoting *Ake* v. *Oklahoma*, 470 U.S. 68, 80–81, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).

Well settled rules, however, dictate that the trier of fact is not bound to accept a defense expert's opinion on insanity, even when the state has presented no rebuttal expert. "The credibility of expert witnesses and the weight to be given to their testimony . . . on the issue of sanity is determined by the trier of fact. . . . *State* v. *Medina*, 228 Conn. 281, 309, 636 A.2d 351 (1994). . . . [I]n its consideration of the testimony of an expert witness, the [trier of fact] might weigh, as it sees fit, the expert's expertise, his opportunity to observe the defendant and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions [that] he drew from them. . . . *State* v. *DeJesus*, 236 Conn. 189, 201, 672 A.2d 488 (1996); accord *State* v. *Patterson*, 229 Conn. 328, 339, 641 A.2d 123 (1994). . . . [A]lthough expert witnesses testified on behalf of the defendant and the state called none, that alone is not a sufficient basis to disturb the verdict on appeal . . . for the [trier of fact] can disbelieve any or all of the evidence on insanity and can construe that evidence in a manner different from the parties' assertions. . . . *State* v. *Medina*, supra, 309–10. It is the trier of fact's function to consider, sift and weigh all the evidence

including a determination as to whether any opinions given concerning the defendant's sanity were undercut or attenuated under all the circumstances. *State* v. *Evans*, 203 Conn. 212, 242, 523 A.2d 1306 (1987); see also *State* v. *Cobb*, 251 Conn. 285, 490, 743 A.2d 1 (1999) (the state can weaken the force of the defendant's presentation by cross-examination and by pointing to inconsistencies in the evidence . . .) [cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000)]." (Internal quotation marks omitted.) *State* v. *Quinet*, 253 Conn. 392, 407–408, 752 A.2d 490 (2000); see also, e.g., *State* v. *Blades*, 225 Conn. 609, 627, 626 A.2d 273 (1993) (rejecting claim that trial court was required to accept defense of extreme emotional disturbance in criminal case in which defendant had proffered expert testimony of psychiatrist and state did not present evidence to rebut defense). "The court might reject [uncontradicted expert testimony] entirely as not worthy of belief or find that the opinion was based on subordinate facts that were not proven." (Internal quotation marks omitted.) *State* v. *Morelli*, 293 Conn. 147, 160, 976 A.2d 678 (2009).

The trier's freedom to discount or reject expert testimony does not, however, allow it to "*arbitrarily* disregard, disbelieve or reject an expert's testimony in the first instance. . . . [When] the [trier] rejects the testimony of [an] . . . expert, there must be some basis in the record to support the conclusion that the evidence of the [expert witness] is unworthy of belief." (Citations omitted; emphasis added; internal quotation marks omitted.) *Builders Service Corp.* v. *Planning & Zoning Commission*, 208 Conn. 267, 294, 545 A.2d 530 (1988); accord *Wyszomierski* v. *Siracusa*, 290 Conn. 225, 244, 963 A.2d 943 (2009); see *Wyszomierski* v. *Siracusa*, supra, 244 (applying rule but concluding that rejection of expert opinion was not arbitrary because opinion was based on fact that had no support in evidence); see also *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 831, 955 A.2d 15 (2008) ("[n]umerous decisions in this court have upheld decisions in which the trier of fact has opted to reject the unrebutted testimony of an expert witness *under appropriate circumstances*" (emphasis added)).

We therefore reject the state's position that the trier of fact is free to reject expert opinion even arbitrarily, and, thus, as long as there is evidence to demonstrate that the state met its burden of proof with respect to the criminal charges, the verdict must be sustained. We simply see no basis in logic or reason for such a rule, which would effectively render a decision rejecting an insanity defense immune from appellate review.

Although the state correctly points out that our court has never applied this principle outside of the civil context, there is no legitimate justification not to apply it equally to criminal cases, as have many other jurisdic-

tions, including in the context of an insanity defense.[15] We caution, however, that, given the myriad bases on which the trier properly may reject expert testimony and the reviewing court's obligation to construe all of the evidence in the light most favorable to sustaining the trier's verdict, it would be the rare case in which the reviewing court could conclude that the trier's rejection of the expert testimony was arbitrary.[16] See *Builders Service Corp.* v. *Planning & Zoning Commission*, supra, 208 Conn. 294, citing *Santana* v. *United States*, 572 F.2d 331, 335 (1st Cir. 1977). This is not such a case.

The trial court made four principal findings in support of its ultimate determination that the defendant had not met his burden of proving his insanity defense: (1) the defendant's conduct immediately following the shooting did not reflect an inability to control his conduct; (2) the defendant's conduct in shooting the victim was not borne out of psychosis but out of frustration and anger, stressful and emotional hurdles (that is, his motivation); (3) the experts' testimony and reports reflected considerable divergence in the bases for their opinions; and (4) the defendant was malingering by exaggerating or fabricating symptoms. We conclude that these findings are largely related rather than wholly independent, find support in the record, and provide a reasonable basis for the trial court's conclusion that the defendant did not meet his burden of proof.

Before turning to these findings, we make an observation regarding the record that colors the lens through which we review the evidence. It is undisputed that the defendant was suffering from some form of psychosis at the time of the offense. The disputed issue at trial and on appeal is whether the defendant proved that his psychosis substantially impaired his ability to conform his conduct to the requirements of the law. Neither expert's report or testimony, however, made any analytical or evidentiary distinction between the question of whether the defendant suffered from a mental disease or defect and the question of whether that disease or defect substantially impaired his ability to act in conformity with the law. Any evidence specifically tied to either question related to the former. Both experts recited all of the evidence they had gleaned and drew from that evidence the *unified* conclusion that the defendant suffered from an unspecified psychotic disorder that substantially impaired his ability in this manner. The significance of failing to draw such a distinction was brought into focus by the concession of both experts, on cross-examination, that the majority of people who have a psychotic disorder or who first experience a psychotic episode do not commit acts of violence or come into contact with the law. Amble went so far as to say that acts of violence by a person having a sudden onset of psychosis—that is, no past history of psychosis, as in the present case—are "rare . . . ."[17] Neither expert, however, identified any particular fea-

ture of the defendant's psychosis, his history, or the circumstances of the offense that would explain why the defendant was this rare case. Cf. *State* v. *DeJesus*, supra, 236 Conn. 198–99 and n.11 (one defense expert, who diagnosed defendant with both psychotic depression that manifested itself in recurrent auditory hallucinations and borderline personality disorder, testified that, when these two mental ailments combine, they tend to weaken one's ability to control his or her behavior, and another defense expert, who diagnosed defendant with several syndromes, including organic personality syndrome, explosive type, testified that this syndrome "mean[t] that once the defendant los[t] control, he [was] unable to regain [it] until he ha[d] vented the rage in some manner"); *State* v. *Steiger*, 218 Conn. 349, 376, 590 A.2d 408 (1991) (Defense expert, who diagnosed the defendant as suffering from schizophrenia with paranoid trends at the time of the offense, explained: "[T]his illness was marked by the defendant's extreme use of fantasy as a retreat from reality and . . . his hold on reality was so tenuous that his fantasies could take on delusional qualities. . . . [T]he defendant was constantly on the defensive against personal insult . . . interpersonal conflict aroused overwhelming emotions in him, and . . . it was likely he would engage in impulsive behavior or disordered thought if he felt insulted, rejected or physically threatened." (Footnote omitted.)). This omission opened the door for the trial court to rely on evidence in the record that may have been intended to relate solely to the question of the presence of a mental disease or defect to support its conclusion that the defendant did not prove that it was more likely than not that his psychosis was the cause of his criminal conduct.

Our review of the record begins with the trial court's finding that the defendant's conduct immediately following the shooting did not reflect an inability to control his conduct. This finding is supported by the following evidence. Officer Wilson's testimony established that, when the defendant was found near the scene, he complied with Wilson's orders to show his hands, drop his weapon, lie down on the ground, and put his hands behind his back. Lieutenant LaMaine's testimony established that the defendant waived his *Miranda*[18] rights following his arrest. The video recording of the police interrogation established that the defendant provided rational responses to many of Detective Ortiz' questions, even if only to say that he did not know the answer to the question. He was exceedingly well mannered during the interview. At the beginning, when the defendant was asked, "[h]ow are you," he responded, "[g]ood, how you doing?" In response to a subsequent question that he apparently did not hear or understand, he asked, "[p]ardon me?" When the interview concluded, the defendant rose and shook Ortiz' hand.

We note that the video recording of the interview is

the only piece of wholly objective evidence from which the experts could have drawn their own conclusions rather than rely on the conclusions drawn by other medical professionals as to the defendant's conduct and demeanor around the time of the offense. Neither expert, however, relied on this video recording to support his opinion. They were in fact unable to offer an opinion, when asked on cross-examination, that the defendant's demeanor and unresponsiveness to several questions were more indicative than not of an active psychosis. Amble responded: "That is such a nonspecific observation that, yes, it certainly could be, and then it might not be; it all depends." Lovejoy was similarly equivocal, stating: "I think you can infer things in a number of directions." The trial court was free, therefore, to conclude that this evidence did not support the defendant's affirmative defense.

Although the question, of course, is whether the defendant proved that he was insane when he committed the offense, his conduct and demeanor shortly before or after the crime are relevant, and no doubt necessary, to making that determination. See, e.g., *People* v. *McCullum*, 386 Ill. App. 3d 495, 504–505, 897 N.E.2d 787 (2008), appeal denied, 231 Ill. 2d 679, 904 N.E.2d 983 (2009); see also, e.g., *State* v. *Patterson*, supra, 229 Conn. 333–34 (detailing evidence relevant to sanity, including acts occurring before and after crime); *State* v. *Medina*, supra, 228 Conn. 305–307 (same). "[One] justification for considering a defendant's demeanor before and after the crime is that conduct occurring in temporal proximity to the crime may be more indicative of actual mental health at [the] time of the crime than mental exams conducted weeks or months later." (Internal quotation marks omitted.) *Galloway* v. *State*, 938 N.E.2d 699, 715 (Ind. 2010). Indeed, both of the defendant's experts in the present case relied heavily on reports of the defendant's conduct and demeanor in the days shortly before and after the incident in reaching their conclusions.

With respect to the specific time of the offense, the trial court found that the shooting was precipitated by the defendant's anger and frustration at having his employment inquiry rebuffed, exacerbated by anxiety and stress relating to that situation, rather than by psychosis. The record provides unequivocal support for the trial court's conclusion that the defendant was suffering from intense levels of stress and anxiety as a result of his chronic unemployment and financial problems at the time of the offense. The defendant argues, however, that his motive for the shooting is relevant only to the question of intent, an element of the state's case, not to his insanity defense. We disagree with this assertion for several reasons.

Whether the defendant had a motive for the crime, unprecipitated by a psychotic delusion that compelled

him to act, was made an issue in the case by one of the defendant's experts, Amble. His report and testimony took pains to consider various reasons for the defendant's action other than his claim of insanity in view of questions raised by his conduct. One reason considered by Amble, which he declined to adopt because the defendant denied it, was that the defendant "became suddenly angry with [the victim] . . . and since he was going to end his life anyway, there was little for him to lose by this action." Amble referred explicitly or implicitly to the defendant's motive several times in his testimony, and his ultimate conclusion rested in part on the "illogical" nature of the act.

Other courts have recognized that motive or the absence thereof may be relevant to the question of whether the defendant has proved his insanity defense. See, e.g., *People* v. *Kando*, 397 Ill. App. 3d 165, 196, 921 N.E.2d 1166 (2009) ("[I]t is undisputed . . . that the incident for which [the] defendant was charged was conceived and took place in the grip of a psychotic delusion. No one suggested an alternative motive for [the] defendant's attack other than to eliminate Satan pursuant to a commandment from God. No one suggested or imputed any other design or motive to explain [the] defendant's actions other than his delusion, namely, that the victim was Satan whom he was determined to kill or incarcerate for [1000] years."); *Barcroft* v. *State*, supra, 111 N.E.3d 1007–1008 (court relied on fact that experts agreed that defendant could have had logical motivation for criminal act that could coexist with, and be independent of, psychotic and delusional behavior). In *State* v. *Quinet*, supra, 253 Conn. 392, this court addressed a related issue when it rejected the argument of the defendant in that case "that his ability to plan cannot be viewed as inconsistent with his claim that, due to the particular nature of his mental illness, he could not control his conduct within the requirements of the law." Id., 409–10. We explained: "[A]n accused who suffers from a mental disease or illness may be able to establish that he was unable to control his conduct according to law even though he had the capacity to plan that illegal conduct. Whether the capacity to plan a course of criminal conduct is probative of an accused's ability to control his behavior within legal requirements necessarily depends [on] the specific facts and circumstances of the case, and ultimately is a determination for the trier of fact. Indeed, we previously have indicated that an accused's ability to formulate a plan to kill is relevant to a determination of whether the accused has the capability of conforming his conduct to the requirements of the law." Id., 410.

We recognize that there are circumstances in which motive would not tend to disprove the defendant's insanity defense. The motive itself may be a by-product or feature of the defendant's mental disease.[19] The motive may exist independently of the mental illness,

but the illness prevents the defendant from resisting the impulse to act on that motive. The motive identified by the trial court does not fall into the first category. The trial court's findings are inconsistent with the second category.

It is at this point that the trial court's motive related finding intersects with its findings that the defendant likely was malingering and that the bases for the experts' opinions materially diverged. Lovejoy credited the defendant's account of experiencing auditory and visual hallucinations—voices in his head telling him that the victim was evil or dangerous and blinking lights at the construction site signaling him—that compelled the defendant to shoot the victim. The trial court's conclusion that the defendant's conduct was in reaction to having his employment inquiry brushed off, a tipping point in the defendant's emotional stress from his chronic unemployment and mounting financial pressures, means that it necessarily rejected the linchpin of Lovejoy's opinion.

Amble's report, by contrast, identified *numerous* reasons why the defendant's self-interested narrative did not ring true.[20] See *Brock* v. *United States*, 387 F.2d 254, 258 (5th Cir. 1967) ("in cases involving opinions of medical experts, the probative force of that character of testimony is lessened where it is predicated on subjective symptoms, or where it is based on narrative statements to the expert as to past events not in evidence at the trial"); see also *Mims* v. *United States*, 375 F.2d 135, 145 (5th Cir. 1967) (citing as reason weighing against conclusiveness of expert opinion that defendant and his common-law wife, who had provided narrative statements that formed basis of expert opinion, "were deeply interested in the outcome of the case"); *State* v. *Patterson*, supra, 229 Conn. 338 (upholding trial court's rejection of insanity defense when trial court "expressly discounted the testimony of the defendant's experts, noting that their diagnoses were based on the generally self-serving interview statements of the defendant and his family members").[21] One such reason that Amble cited was that the defendant's account of hearing his own voice coming from inside his head is "an atypical presentation for auditory hallucinations." Amble ultimately opined in his report that "the defendant is providing a malingered explanation for why he committed the act that resulted in his arrest" and that the rationale for his action was "a mystery." The basis of Amble's opinion, therefore, materially diverged from the basis of Lovejoy's opinion and provided a reasonable basis for the trial court to reject Lovejoy's opinion. See *Brock* v. *United States*, supra, 258 (citing "material variations between the experts themselves" as basis to reject expert testimony); see also *State* v. *Steiger*, supra, 218 Conn. 380–81 (noting that basis of state experts' disagreement with defense experts as to diagnosis of paranoid schizophrenia was "the lack of evidence that the

defendant was preoccupied with 'systematized delusions' "); cf. *State* v. *Morelli*, supra, 293 Conn. 160 (trier properly may "find that the [expert] opinion was based on subordinate facts that were not proven" (internal quotation marks omitted)).

There is evidence in the record other than Amble's opinion that supports the trial court's conclusion that the defendant was exaggerating or fabricating certain symptoms. The defendant had no prior history of mental health treatment, other than for substance abuse. "The lack of a well-documented history of mental illness— whether schizophrenia or other acute psychiatric disorder—does not necessarily preclude a finding of insanity. But the lack of such history is a circumstance that a [fact finder] may consider in evaluating an insanity defense." (Internal quotation marks omitted.) *Barcroft* v. *State*, supra, 111 N.E.3d 1008. The defendant admitted to Amble that he had never told anyone, prior to the shooting, that he had been experiencing hallucinations, although he claimed that he had been getting messages and light signals from his television for some time. In his encounters with the police, near the scene, and at the police station, the defendant never referred to the victim's being evil or dangerous, to lights signaling him, or to some person, entity, or thing compelling him to shoot the victim. Cf. *State* v. *Medina*, supra, 228 Conn. 285 (defendant told police officer who arrived on scene that "[t]he devil made me do it," "[I] killed the devil," and "I am God" (internal quotation marks omitted)); *State* v. *Campbell*, 169 Conn. App. 156, 162, 149 A.3d 1007 ("[Responding police officer] observed the defendant speaking to someone who was not there, and the defendant asked aloud, 'why did you make me do it?' [The officer] also testified that the defendant's overall demeanor was volatile; the defendant would be calm one moment, then the next moment, become angry and bang his head."), cert. denied, 324 Conn. 902, 151 A.3d 1288 (2016); *People* v. *Kando*, supra, 397 Ill. App. 3d 179, 181 (expert characterized defendant's statements reflected in police reports of incident as " 'delusional' " and as similar to his past statements that had been "documented as 'hyper-religious delusions' "). After the shooting, the defendant repeatedly denied that he was experiencing auditory or visual hallucinations, both to Bridgeport Hospital staff and to Downer upon his transfer to the Department of Correction.

Almost all of the defendant's comments in the immediate aftermath of the shooting bore some relationship to the subject of employment or his feelings of worthlessness. Amble's report notes that the defendant described his state of mind, immediately before he left his home on the day of the incident, as "becoming more *angry* at his situation." (Emphasis added.)

Finally, we would not characterize Amble's opinion, in which he acknowledged the defendant's malingering

but nonetheless stated that the defendant's psychosis impaired his ability to conform his conduct to the law, as reflecting a high degree of confidence or as highly persuasive. We recognize that the exaggeration or fabrication of symptoms does not necessarily negate the possibility that the defendant met the criteria for the insanity defense. See *State* v. *Steiger*, supra, 218 Conn. 365 n.16 ("Most defendants will understand that what they say and how they act during a psychiatric examination will affect their chances of successfully asserting an insanity defense. . . . The pressure on defendants to lie or to feign what they conceive of as insane symptoms will be intense, even for those whose insanity defenses are legitimate. Even the truly mentally ill person is likely to have some stereotyped conception of what distinguishes sanity from insanity and to manifest symptoms of the latter." (Citation omitted; internal quotation marks omitted.)). Amble's report and testimony, however, were quite tentative as to his conclusions, and he discounted statements attributing the murder to employment concerns for reasons—that they either "didn't seem to make sense" or that the defendant had denied this motivation—the trial court was fully entitled to find unpersuasive. Amble's opinion rested largely on reports from the defendant's wife and two friends that the defendant had engaged in bizarre behavior in the days before the incident, and that the act of shooting the victim seemed illogical, poorly planned, and devoid of any benefit to the defendant. Amble acknowledged, however, that a criminal act may have these features and yet not be the product of psychosis. Similarly, the strange conduct attributed to the defendant, if true, lent support to Amble's conclusion that the defendant suffered from some unspecified psychotic condition.[22] But none of these acts involved harm, or attempted harm, to another person or property, and, therefore, those acts do not tend to prove that the defendant's ability to conform his conduct to the requirements of the law was substantially impaired. This point brings us back to where we began: the experts agreed that a person may suffer from a psychotic condition and yet have the ability to conform their conduct to the requirements of the law. The mere fact that the defendant violated the law does not establish the requisite connection, and, for the foregoing reasons, the trial court was not bound to accept the opinions of the defendant's experts insofar as they purported to make that connection.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

** May 28, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes (Rev. to 2015) § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity,

as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

Hereinafter, all references to § 53a-13 are to the statutory revision of 2015.

[2] Shortly before the defendant arrived at the scene, a patrolman with the Bridgeport Police Department who was working overtime duty at the construction site left the site to get coffee for the construction crew. The patrolman was returning to the site and was within view of it when he heard shots fired.

[3] The notes from Bridgeport Hospital indicate that the police brought the defendant to the hospital "after he expressed suicidal ideation while in police custody."

[4] The defendant was able to provide the detectives with some background information, including but not limited to the city and state where his mother then resided, the town where he grew up, the high school that he attended in a different city, his child's name and birthday, his wife's maiden name, the name of her employer, and her position at her place of employment. He also told the officers that he took the gun from his basement.

[5] The Bridgeport Hospital records reflected an assessment of the defendant as "severe" on Axis IV and an assignment of a "20" rating on Axis V (Global Assessment Functioning (GAF)). No staff from Bridgeport Hospital testified, and no evidence was presented to explain the basis for these ratings. Neither Lovejoy nor Amble indicated that either of them had spoken with hospital medical staff. Although the multi-axial system was abandoned in 2013 in the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5); see, e.g., H. Ringeisen et al., Center for Behavioral Health Statistics and Quality, DSM-5 Changes: Implications for Child Serious Emotional Disturbance (2016) p. 5, available at https://www.ncbi.nlm.nih.gov/books/NBK519708/pdf/Bookshelf_NBK519708.pdf (last visited May 26, 2021); Axis IV "was used [in the fourth edition of DSM (DSM-IV)] to describe psychosocial and environmental factors affecting the person," including, among other factors, economic problems, occupational problems, and, most notably, "[p]roblems related to interaction with the legal system/crime . . . ." N. Schimelpfening, The 5 Axes of the DSM-IV Multi-Axial System (last updated February 4, 2020), available at https://www.verywellmind.com/five-axes-of-the-dsm-iv-multi-axial-system-1067053 (last visited May 26, 2021). The defendant's rating of 20 on the GAF corresponded to "[s]ome danger of hurting self or others or . . . gross impairment in communication." Id. It is unclear whether these ratings stemmed principally or exclusively from the defendant's arrest for a homicide and the concern expressed by the police that the defendant presented a possible suicide risk. A similar question arises from the hospital notation of impaired impulse control.

[6] "In his written evaluation, Amble provided excerpts of the relevant portions of the defendant's medical records from the [D]epartment [of Correction]. According to Amble, Downer completed an initial psychiatric evaluation of the defendant on March 31, 2015, and noted: 'While he presented as odd, [I believe] his behavior was intentional as he is trying to feign mental illness to avoid penalty for [the criminal] charges. He was avoidant of eye contact and while seated, [seemed] to be, "coming in and out" of different states of orientation and confusion. The mood is euthymic and with odd, bizarre affect. [He] [d]enies auditory or visual hallucinations, denies suicidal or homicidal ideation.' According to Amble, on April 6, 2015, Downer further noted: 'In light of collateral information, past custody records and presentation over his time in the infirmary, it can be stated with confidence [that the defendant] does not suffer [from] a mental illness and is not in acute risk of hurting himself or others. With the exception of the initial encounter, [the defendant] has been clear, logical and coherent, manifesting no symptoms of mood or psychotic disturbance. [I] [i]nformed him he would be discharged and he will continue to be seen by mental health [personnel] for supportive intervention with psychotropic intervention to be employed if deemed necessary.' " *State* v. *Weathers*, supra, 188 Conn. App. 614–15 n.13.

[7] Lovejoy noted in his report: "Ongoing treatment with mental health specialists has resulted in diagnostic conceptualizations that would account for [the defendant's] psychotic symptoms. These diagnostic considerations have included psychotic disorder [not otherwise specified], brief psychotic disorder, schizophrenia and a mood disorder with psychotic features. This examiner is in agreement with the direction of the diagnostic workups. However, more time and a better understanding of ongoing symptoms [are] necessary before a final diagnosis can be obtained [and] confirmed."

[8] Amble's report simply characterized the defendant as having a "psychiatric illness . . . ." On direct examination, he characterized the defendant as

suffering from "a psychosis" or "a psychotic illness." He acknowledged on cross-examination that he had not come to any sort of diagnosis more specific than overall psychosis and that he "took the diagnosis from the Department of Correction record that was generally a psychotic disorder not otherwise specified." He explained that psychosis not otherwise specified is "kind of a loose diagnosis . . . the kind of diagnosis you give when . . . [the subject] has got some impairment in thinking that may include delusions, and it may not; it may include paranoia and it may not; but it is substantial impairment in [his] reasoning abilities and in the clarity of [his] thinking . . . . I am not sure what it is, but the best diagnosis [I've] got out there is a psychotic disorder not otherwise specified."

[9] These explanations were: (1) the defendant was unable to kill himself and killed the victim to provoke the police to kill him; (2) the defendant "became suddenly angry with the individual who[m] he shot, and, since he was going to end his life anyway, there was little for him to lose by this action"; (3) the defendant was so distraught about his present circumstances and so depressed that he would rather spend time in prison than in the community; and (4) there was a prior conflict between the defendant and the victim that had not yet come to light.

[10] According to Amble, bath salts are also known as synthetic marijuana, which " 'has a much more potent . . . psychogenic effect on individuals [than marijuana],' and . . . is commonly used by people who know that they are going to be subjected to drug testing because there is not a readily available, reliable test for it." *State* v. *Weathers*, supra, 188 Conn. App. 619 n.15. Amble noted the possibility that the defendant had been intoxicated by a substance that was not included in the toxicology test performed at Bridgeport Hospital but that this possibility remained speculative. Although the experts and police witnesses agreed that the defendant's presentation was consistent with someone who was under the influence of PCP or a similar substance, the trial court found that there was insufficient evidence to conclude that any such substance had caused the defendant's mental state. See id.

[11] "Regarding the 'labor dispute' explanation [that] he had given to LaMaine, the defendant told Amble, '[i]t was like I was a mechanic and this was a labor dispute.' . . . When asked what was specifically in his mind at the time of the offense, he responded, 'I don't know where [this explanation] came from and why.' " *State* v. *Weathers*, supra, 188 Conn. App. 620 n.16.

[12] The defendant also had been charged in a fourth count with stealing a firearm in violation of General Statutes § 53a-212 (a), but the charge was dismissed after the state entered a nolle prosequi as to that charge at the close of its case-in-chief.

[13] Specifically, the defendant contends that (1) the trial court's disagreement with the expert testimony is not itself evidence and therefore cannot constitute conflicting evidence, (2) the Appellate Court incorrectly concluded that the experts' opinions were "[w]eakened" by the defendant's embellishment of symptoms over time, (3) Amble's failure to account for the defendant's irrational labor dispute statement to the police upon arrest did not " '[a]ttenuate' " Amble's opinion, (4) Amble was not equivocal in his conclusions, (5) the Appellate Court improperly adopted the trial court's conclusion that Lovejoy was not worthy of belief, (6) the Appellate Court improperly rejected Lovejoy's opinion on the basis of his " '[p]hilosophical' " dispute with the distinctions between the volitional and cognitive prongs of § 53a-13, and (7) the experts' admissions on cross-examination that some persons suffering from psychotic disorders can control themselves did not undermine their opinion that "[t]his [p]sychotic" defendant could not control himself. We address these claims to the extent that we endorse the same reasoning as the Appellate Court.

[14] The state, in its brief to this court, appears to take the position that our review is not limited to whether there is evidentiary support for the specific reasons articulated by the trial court for rejecting the defendant's insanity defense. Although the defendant's brief to this court reflects the opposite approach, neither party's brief addressed this specific question in any detail; nor did either party provide this court with authority supporting their position when the issue was raised at oral argument. We note that, unlike in a case tried to a jury, the trial court is required to issue a decision that "shall encompass its conclusion as to each claim of law raised by the parties and the factual basis therefor." Practice Book § 64-1 (a). Because we conclude that the reasons articulated by the trial court properly support its decision, we need not consider whether the state's position is correct or whether the trial court's reasons should be treated like a special verdict. See *State* v.

*Perez*, 182 Conn. 603, 606, 438 A.2d 1149 (1981) ("Our review of the conclusions of the trier of fact . . . is the same whether the trier is a judge, a panel of judges, or a jury. . . . Upon a verdict of guilty we review the evidence in the light most favorable to sustaining the verdict. . . . It is not necessary for us to determine the reasons [that] the trier had for concluding that the defendant had substantial capacity both to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of law. *Absent a special verdict*, we need not consider the route by which the trier arrived at its result." (Citations omitted; emphasis added.)); see also *State* v. *Quinet*, 253 Conn. 392, 410–11, 752 A.2d 490 (2000) ("[A]lthough it is true that the trial court underscored the fact that the defendant had carefully planned his course of conduct, the court did not indicate that it had relied exclusively on such evidence in rejecting the defendant's insanity defense. Thus, we are free to examine the entire record to determine whether a fact finder reasonably could have concluded that the defendant had failed to establish that he lacked substantial capacity to control his desire to commit rape and murder." (Internal quotation marks omitted.)); *State* v. *Cobb*, 251 Conn. 285, 383, 743 A.2d 1 (1999) ("[f]urther articulation of a panel's criminal verdict is unnecessary [when] the verdict adequately states its factual basis, and [when] the record is adequate for informed appellate review of the verdict"), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

[15] See, e.g., *United States* v. *Hall*, 583 F.2d 1288, 1294 (5th Cir. 1978) ("A defendant is not entitled to a judgment of acquittal simply because he offers expert testimony on the issue of insanity and the [g]overnment attempts to rebut it without any expert witnesses. The expert's opinion, even if uncontradicted, is not conclusive. At the same time, it may not be arbitrarily ignored, and some reason must be objectively present for ignoring expert opinion testimony." (Footnote omitted.)); *Pickett* v. *State*, 37 Ala. App. 410, 414, 71 So. 2d 102 (1953) ("Even undisputed expert medical evidence is not conclusive upon the jury, but must be weighed like other evidence, and may be rejected by the jury. . . . Even so, opinion evidence, even of experts in insanity cases, is to be weighed by the jury, and may not be arbitrarily ignored." (Citations omitted.)), cert. denied, 260 Ala. 699, 71 So. 2d 107 (1954); *People* v. *Kando*, 397 Ill. App. 3d 165, 196, 921 N.E.2d 1166 (2009) ("[T]he relative weight to be given an expert witness' opinion on sanity . . . cannot be arbitrarily made, but rather must be determined by the reasons given and the facts supporting the opinion. . . . Accordingly, while it is within the province of the trier of fact as the judge of the witness' credibility to reject or give little weight to . . . expert psychiatric testimony, this power is not an unbridled one . . . and a trial court may not simply draw different conclusions from the testimony of an otherwise credible and unimpeached expert witness . . . . (Citations omitted; internal quotation marks omitted.)); *State* v. *White*, 118 Ohio St. 3d 12, 23, 885 N.E.2d 905 (2008) ("the trial court failed to set forth any rational basis grounded in the evidence for rejecting the uncontradicted testimony of two qualified expert witnesses in the field of psychology"); *State* v. *Brown*, 5 Ohio St. 3d 133, 135, 449 N.E.2d 449 (1983) (expert's opinion on insanity defense, "even if uncontradicted, is not conclusive," but, "[a]t the same time, it may not be arbitrarily ignored, and some reasons must be objectively present for ignoring expert opinion testimony." (internal quotation marks omitted)).

[16] See, e.g., *State* v. *Patterson*, supra, 229 Conn. 338–39 ("The [trial] court . . . expressly discounted the testimony of the defendant's experts, noting that their diagnoses were based on the generally self-serving interview statements of the defendant and his family members. In the court's view, those experts had failed adequately to account for the defendant's apparently premeditated attack on the victim, his efforts thereafter to avoid detection and apprehension, and his equally calculated attempts to manipulate the diagnostic staff at Whiting [Forensic Institute]. The court also noted that the defendant's experts had agreed that persons suffering from paranoid schizophrenia are not necessarily unable to distinguish between right and wrong, and that the expert testimony had failed to demonstrate that the defendant, at the time of the fatal shooting, had been unable to do so."); *State* v. *Medina*, supra, 228 Conn. 305–306 (rejecting defendant's claim that evidence established, as matter of law, his affirmative defense of insanity by preponderance of the evidence and noting that "[a] review of the evidence introduced at trial . . . reveal[ed] a sufficient basis for the jury's rejection of the defendant's affirmative defense"); *State* v. *Smith*, 185 Conn. 63, 74, 441 A.2d 84 (1981) (concluding that jury reasonably rejected expert opinion when "the testimony of the lay witnesses allowed the jury to conclude that

the defendant had consumed less alcohol and valium than the amounts [on] which the experts based their opinions"); *State* v. *Campbell*, 169 Conn. App. 156, 167, 149 A.3d 1007 ("The court identified and analyzed evidence relating to [the expert's] opinion that tended to suggest it was unconvincing. Also, the court found that [the expert] appear[ed] to dismiss [differing analyses of the defendant] as just another opinion. Further, the court was convinced that the state undermined [the expert's] testimony through its cross-examination." (Internal quotation marks omitted.)), cert. denied, 324 Conn. 902, 151 A.3d 1288 (2016).

[17] The defendant quotes one statement from Lovejoy in which he states that "some" persons with psychotic disorders can control themselves but ignores the more sweeping admissions of both experts.

[18] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[19] For example, John W. Hinckley, Jr., was found not guilty by reason of insanity, even though he had a clear motive for his assassination attempt on President Ronald Reagan, namely, to impress actress Jodie Foster, a cast member of the film Taxi Driver, in which one of the characters stalks the president, and with whom Hinkley had become obsessed. See G. Harris, "Reagan's Assailant Is Ordered Released," N.Y. Times, July 27, 2016, p. A17; L. Kiernan, "Hinckley, Jury Watch 'Taxi Driver' Film," Wash. Post, May 29, 1982, p. A1. There was no evidence in the record in the present case that the defendant's anger and frustration from his chronic unemployment were caused by his psychosis.

[20] One reason that Amble cited was Downer's conclusion in Department of Correction records that the defendant was fabricating symptoms of mental illness. Indeed, the Appellate Court cited Downer's opinion as support for the trial court's malingering finding. The defendant contends that Downer's opinion could not be used as substantive evidence because neither expert relied on it, her report was not admitted into evidence, it was hearsay, and her qualifications as an expert were not established. He further contends that he never made a concession that Downer's opinion was in evidence, as the Appellate Court indicated. We need not decide whether Downer's opinion could be used as substantive evidence. The trial court did not reference Downer's opinion in its decision—although it did ask Amble about his consideration of that opinion—and we do not rely on her opinion in reaching our conclusions. We note, however, our disagreement with the defendant's view that Amble did not rely on Downer's conclusions. Amble did not agree with Downer's ultimate conclusion that the defendant was feigning mental illness, but he appeared to give some weight to her opinion that the defendant was exaggerating his symptoms.

[21] The defendant contends that the trial court cannot discount statements provided to the experts on the ground that they were provided by interested parties unless the declarant of those statements testifies and thus affords the trial court an opportunity to assess his or her credibility. We note that the defendants in *Mims* v. *United States*, supra, 375 F.2d 135, and in *State* v. *Patterson*, supra, 229 Conn. 328, did not testify, and there is no indication that the defendant's common-law wife in *Mims* testified.

[22] The defendant did not offer his wife or either friend as witnesses. One of the two friends declined to give his legal name to the experts, providing only his nickname, and Amble was unable to make contact with this man to follow up on his initial statement.

---