******************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* LEROYA M.*
## (SC 20351)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted, after a trial to a three judge panel, of two counts of murder in connection with the deaths of her two children, the defendant appealed to this court. The police reported to the defendant's home in response to a phone call from the defendant's friend, who had received an alarming letter from the defendant in the mail. When the defendant exited her home after the police arrived, she had lacerations on her wrists and told the police that she had "saved them." While the defendant was transported to the hospital, the police entered the defendant's residence and found the children's bodies, as well as a suicide note written by the defendant, in which she stated that, "if I burn for eternity at least I'll know why I deserve it." Autopsies revealed that the children died of acute intoxication from an antihistamine with sedative properties. At trial, the defendant did not dispute that she had killed her children but raised the affirmative defense of mental disease or defect, claiming that, at the time of the murders, she lacked the substantial capacity to either appreciate the wrongfulness of her conduct or to control her conduct within the requirements of the law. The defendant's version of events was admitted into evidence largely through the testimony and written report of her expert witness, A, a forensic psychiatrist. According to A, the defendant was suffering from psychosis and, as a result, developed a "religious delusion" that killing her children and herself was "God's plan." In A's opinion, at the time she killed her children, the defendant did not appreciate that what she was doing was wrong and was not able to control her conduct in accordance with the law. A recounted how, on the day in question, the defendant took the children to a store and then to a fast food restaurant, where she conceived of a method to end their lives. Specifically, because the children had not yet been baptized, she decided to drown them to accomplish their death and salvation. According to A, the defendant bought over-the-counter sleep aids, which she gave to the children upon returning home. While they were sedated, she held their heads underwater in the bathtub. The defendant purportedly heard the voice of God tell her that it was time to come home. The state presented the testimony of its own expert, L, a forensic psychiatrist. According to L, there was no evidence that the defendant had suffered from a serious mental disease or defect at the time of the murders but, instead, had killed the children because she was angry about raising them alone. According to L, the manner in which the defendant committed the murders, certain statements the defendant made in her suicide note, and other communications were inconsistent with a religious delusion and affirmatively reflected the defendant's appreciation of the wrongfulness of her actions. The trial court found that the defendant failed to satisfy her burden of proving that, as a result of mental disease or defect, she lacked substantial capacity to appreciate the wrongfulness of her conduct or to control her conduct within the requirements of the law. The court determined that A's testimony was undermined by his failure to investigate or to adequately explain evidence of the defendant's behavior that the court found to be inconsistent with a religious delusion, including the defendant's communications exhibiting an appreciation of the wrongfulness of her conduct in the days leading up to the murders, her Internet research into the methods of poisoning children, and her provision of lethal amounts of medication to her children. On the defendant's appeal to this court, *held* that the trial court reasonably rejected the defendant's defense of mental disease or defect and the opinions of A related thereto, and, accordingly, this court affirmed the judgment of conviction: opinion testimony from mental health experts is central to a determination of the viability of the defense of mental disease or defect, and the credibility of expert witnesses and the weight to be given to their testimony on

that issue are determined by the trier of fact, which may discount or reject expert testimony, so long as the discounting or rejection of such testimony is not arbitrary; in the present case, this court concluded that the trial court did not arbitrarily reject A's testimony, especially in light of the directly conflicting expert testimony of L, including testimony that the defendant's narrative of drowning her children while in the grip of a religious delusion was unsupported and contradicted by the defendant's organized and focused behavior during the relevant time period, including her Internet activity, her communications with friends and family, her purchasing and printing of a mailing label to send the letter to her friend, and the statements in her suicide note that she would "burn for eternity" for her actions; moreover, A's testimony was undermined by other evidence adduced at trial, including testimony from the defendant's friends and family that they had communicated with the defendant in the days immediately before or after the murders and did not observe any symptoms of psychosis or religious delusion, the defendant's text messages and Internet search history, and the autopsy reports, which conflicted with defendant's report that her children had died from drowning; furthermore, contrary to the defendant's claim, the fact that L conducted fewer interviews and spent less time with the defendant than A did was of no consequence, as the trial court, which was responsible for determining the credibility of the expert witnesses and the weight to be given to their testimony, reasonably credited L's testimony.

Argued February 24—officially released September 13, 2021**

*Procedural History*

Substitute information charging the defendant with two counts of the crime of murder, brought to the Superior Court in the judicial district of New Haven and tried to a three judge court, *Vitale* and *B. Fischer, Js.*, and *Hon. Jon C. Blue*, judge trial referee; finding and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Naomi T. Fetterman*, for the appellant (defendant).

*Timothy F. Costello*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Stacey M. Miranda*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ECKER, J. The defendant, LeRoya M., was charged with two counts of murder in violation General Statutes § 53a-54a (a) for killing her seven year old son, D, and her six year old daughter, A. The defendant elected a trial before a three judge court; see General Statutes § 54-82 (a) and (b); and presented expert testimony in support of an affirmative defense of lack of capacity due to mental disease or defect pursuant to General Statutes § 53a-13,[1] otherwise known as the insanity defense. The state presented expert testimony at trial to rebut the defendant's insanity defense. The trial court ultimately did not find the defendant's expert testimony to be reliable or credible and, as a result, concluded that the defendant had "failed to satisfy her burden of proving that, as a result of mental disease or defect, she lacked substantial capacity to appreciate the wrongfulness of her conduct or to control her conduct within the requirements of the law." On appeal, the defendant claims that no rational fact finder reasonably could have rejected her insanity defense on the present factual record. We disagree and affirm the judgment of conviction.

In a thorough memorandum of decision, the court found the following relevant facts, as supplemented by the undisputed evidence adduced at trial. On Tuesday, June 2, 2015, the defendant's best friend of eighteen years, Jazmin Santiago, received a letter and two credit cards from the defendant in the mail. "In the letter, the defendant directed . . . Santiago to use the credit cards to 'take care of the [kids'] tuition as much as you can . . . make sure you take the [money] out and use it for your kids. My mom is my beneficiary for everything. I did what I could for as long as I could.' " The letter was posted via a United States Postal Service "Click-N-Ship" label, which had been produced online and printed by computer on May 28 or 29, 2015. The return address on the label was the defendant's residence in East Haven.

"Santiago, alarmed by the contents of the letter, called the defendant's cell phone at approximately 2:21 p.m. on June 2. The defendant did not answer. . . . Santiago followed up with a text message to the defendant's cell phone and again received no response. . . . Santiago continued to call the defendant's cell phone, and the defendant eventually answered the phone. The defendant told . . . Santiago that 'she was tired.' . . . Santiago asked the defendant if 'she was okay,' and the defendant responded that she 'was okay.' Not satisfied with the defendant's response . . . Santiago continued to inquire of the defendant and asked the defendant to come to her home. The defendant stated she 'could not come over.' Undeterred, Santiago told the defendant that she would come to the defendant's residence, and the defendant stated that, if Santiago did so, she 'would

not open the door.' Nevertheless . . . Santiago drove to the defendant's house and brought the defendant's letter along with her. The defendant lived 'five minutes' from her home.

"The doors and windows of the defendant's house were locked when . . . Santiago arrived. The defendant did not answer the door. Santiago called the defendant's cell phone . . . . The defendant answered and said she was 'okay' and 'resting.' During one of their ensuing cell phone conversations . . . Santiago asked the defendant about [D] and [A]. The defendant told . . . Santiago that '[A] was good' and '[D] was sleeping.' Alarmed [by] the defendant's conduct and statements . . . Santiago next called 911. . . .

"When the police arrived . . . Santiago gave the police at the scene her cell phone. The police told Santiago to call the defendant, but the defendant did not answer the phone. Rather, the defendant opened the second floor exterior door of the residence . . . [and] descended the stairs . . . ." As she descended the stairs, the defendant asked the police, " 'can we just leave,' " and told them that "she had 'saved them.' " The police noticed lacerations on the defendant's wrists, which were treated by members of the East Haven Fire Department. The defendant was transported to Yale-New Haven Hospital and subsequently admitted to the Yale Psychiatric Institute (YPI) for a mental health evaluation.

In the meantime, "[a]s the events on scene unfolded . . . Santiago frantically asked the police to check on the whereabouts of [D] and [A]." East Haven police officers entered the defendant's home using the exterior stairway on the second floor to search for the children. Upon entry, "[t]he police encountered an 'overwhelming' presence of natural gas . . . . The police were forced to exit the home and notified the fire department on the scene. Once the fire department 'shut off' the gas supply, the police reentered the home to search for the children. . . . The children were eventually located on the first floor [in the living room]. It was readily apparent to the police due to the decomposition of the children's bodies and attendant smell that each of them was dead" and "had been there 'a long time.' "

Near the feet of the children's bodies, the police found a letter written by the defendant (suicide note), which provided:

"I'm sure there's an expert somewhere [who] will say the children suffered, but I let them know they were loved very much and they were going to heaven. We said the Lord's Prayer to protect their souls. I know this was meant to end the way it did. I don't know the reason why, but we were meant to die today. After [thirty-five] years, I was convinced for a while I would be okay and I wouldn't ever be this sad again because

I had great jobs, good kids and a house and car and I did these things all by myself. I am all by myself still. I'm not meant to be here past this time. It's [okay] and I'm not scared. I'm numb and if I burn for eternity at least I'll know why I deserve it. I don't know what I did to deserve this life and these kids didn't deserve to be brought into it to have sadness and suffering all of the time. I watch them cry and act out because they don't know what they did for their parents to leave them to fend for themselves.

"I was alone and I was meant to be alone. There is no true way to come back from who I am. I am not looking for pity. I want the opposite. Years from now I will be forgotten but we're all dust. God already knew who I was. I couldn't leave [any more] of my kids to the system. They don't all get a happy ending. I love them all. I love them all so much I only wanted to be better for them but they were missing the [one] thing I couldn't ever give them on my own. They were in pain and now they're in heaven. I prayed and God knows my heart, he made me the way I am and knew we weren't fit for this world past this time.

"There will thankfully be no fighting over anything I have. I will be cremated and the bank will get the house and the car. That's it. I really tried. [Thirty-five] was great, my friends and family were great. We all have our own lives. There's nothing anyone could've done. I asked God to stop me if I was making a mistake. I asked to show me I was wrong and save them. They should not be left to burden anyone because I am the only one who could love them like a mother. Not an institution or a social worker.

"[M],[2] you cut me out then cut me up, you left these children and only started to care when you saw I was seeing someone else. You couldn't even be a man and admit you hit and choked me. You just wanted to hurt and ruin me and now you have. You cut off the nose but you're the face and you'll suffer from your decisions. I told you when I first got pregnant with [D] that I could not be a single parent again. You did that and left these children to mourn for you every night before bed and in school when they should've been happy with friends. You get your child support back, you save all your money and possessions you cared about more than your family. I warned you I couldn't do it alone when we were going to reconcile but you left them again anyway. You can't take care of them any better than I was and now they'll always be a faint memory. Your daughter [J][3] should be happy about the things she said to them. You should feel better that she was being abusive to them and you did nothing about it. I will not let anyone abuse or take advantage of [any more] of my children. I hope the things [J] did to them will haunt her for the rest of her life. They will be in heaven with people who we lost and loved. They deserve that.

"They got to do all of the things they wanted to do before they died today. They ate their favorite things. They had ice cream and they wanted to paint their nails so we got nail polish and they had fun and really liked how it came out. I saw them truly happy not being shipped off to multiple babysitters and just hanging out with mommy. I always knew I'd be a mom but I just wish I had children within a family with the man who was supposed to care for me and cares for his family the way he should have with me. I would have been a different mother. I would have had happy children and even if I was sad and unable to care for them, he would have been there to care for us all and I would have gotten through it and maybe made it to [thirty-six]. I just couldn't imagine the [second] half of my life being this way. Dragging my kids along for the ride. I made the mistake the first time and didn't end things when I could have . . . before I made it far and had more kids. My older kids escaped the same fate because I was too depressed to move and make it happen. My angel saved me, saved us. Now they are suffering. I won't do this injustice to my other kids. [D.W.][4] is sadly already lost. [N][5] is without a home and a family who loves her. [D.J.][6] has survived despite his challenges and I can only hope he's happy and healthy.

"There's no more pain for [D] and [A]. They left this world as innocent as they were when they came into it . . . not scarred and [heartbroken] by people who make promises to love and protect them. They won't have the loss and betrayal of girlfriends and boyfriends who promise to always be there. I wish my parents would have awarded me the same courtesy if the thought ever crossed their minds just once. We're all just dust. I'm [thirty-five] and I did good things at least in the past [eight] years. It wasn't enough to make me or my children happy. None of it mattered. I raised them not to covet 'things' and they didn't, they wanted a happy life with a family. I just couldn't give them that.

"I'm done. There's nothing else to say and no further explanation to give. We love you and be proud of these [two] angels that will watch over and protect you all." (Footnotes added.)

A subsequent autopsy revealed that the cause of D's death was "acute diphenhydramine intoxication and that his manner of death was homicide." Diphenhydramine "is an antihistamine with sedative properties" that is found in many " 'over-the-counter' medications," such as Benadryl. With respect to A, an autopsy revealed that the "cause of [her] death was acute intoxication from the combined effects of diphenhydramine and alcohol, and her manner of death was homicide. Significantly . . . the toxicology examination revealed that the ethanol level present in [A] was .091," which is above the .08 "threshold sufficient for prosecution of an adult for operating a motor vehicle while under the

influence."

During the search of the defendant's home, the police found a "significant quantity of both 'over-the-counter' and prescription medication," including medications containing the active ingredient diphenhydramine. The police also found a "substantial quantity of alcohol, including tequila, vodka, 'Southern Comfort,' and beer . . . ." The police seized the defendant's cell phone, from which they were able to extract her text messages, e-mails, and Internet search history from " 'around the time frame' of the crimes." This data helped to establish a timeline for the murders and illuminated the defendant's state of mind during the critical time period of May 27, through June 2, 2015.

The defendant's Internet search history revealed that she "began searching for methods to kill her children on Wednesday, May 27, 2015. Fourteen such searches occurred on May 27, and many related generally to 'overdose' deaths. The searches resumed on Thursday, May 28, 2015, and specifically . . . referenced diphenhydramine. The searches related to 'overdose' continue from May 28, through June 1, 2015."

The defendant communicated with her family, friends, coworkers, and daycare provider during this time. For example, on May 28, the defendant texted her daycare provider that "the kids won't be coming [today]." The defendant texted her employer on May 29, that, "I'm sorry I'm not going to make it in today." After D and A failed to arrive at daycare as scheduled on May 29, and June 1, her daycare provider texted and called the defendant repeatedly to inquire about the whereabouts of the children. On the morning of June 2, the defendant texted a response to her daycare provider, stating, "[m]y dad died I'm just trying to cope . . . [w]e're going to be home this week," even though the defendant's father was alive and well.

The defendant also communicated with her oldest son, D.W., after he arrived at her home on the evening of June 1, to retrieve some belongings. While D.W. was on the defendant's front porch knocking on the door, the defendant texted him that "[m]y car is not working and I'm at [work]. If [you] want to come back [Friday] or Saturday." D.W. noticed the "strong smell of gas" emanating from the defendant's residence but "figured she was at work and everything was fine" and left.

Sometime between May 27, and June 2,[7] the defendant drafted and "deleted a text message to her mother, in which she told her mother, 'I don't want or deserve a service . . . I just want to be cremated,' and another which indicated, 'I love you and I'm sorry. I couldn't leave any burdens for others to [bear].' " The defendant also texted M, her ex-husband and the father of D and A. The trial court characterized the tone of these text messages as "angry and spiteful . . . ." "The tone is

similar to the passages in . . . the defendant's admission and purported suicide note . . . ." For example, the defendant wrote "a derisive and spiteful text" message to M that " '[you] got off [scot] free,' and 'I hope you enjoyed the moments you took for granted . . . .' " Additionally, the defendant texted her former boyfriend regarding "their past romantic involvement . . . ."

After the police completed their investigation, the defendant was arrested and charged with two counts of murder. At trial, the defendant did not dispute that she had killed D and A but raised the affirmative defense of insanity, arguing that, "at the time she allegedly committed the proscribed act or acts, she had a mental disease or defect and that, as a result of that mental disease or defect, lacked the substantial capacity to either appreciate the wrongfulness of her conduct or control her conduct within the requirements of the law."[8] In support of this defense, the defendant presented the expert testimony of two witnesses: Vinneth Carvalho, her treating psychiatrist at York Correctional Institution (YCI), and Paul Amble, a board certified forensic psychiatrist. Carvalho testified that, when the defendant was admitted to the psychiatric infirmary at YCI on June 10, 2015, she was suffering from auditory hallucinations, persecutory delusions, and paranoia. Specifically, the defendant reported that "she was hearing the voice of God, and she talked about the voice of God telling her to protect her children, and that— that was why she killed her children. She wanted to protect them. She felt—she couldn't understand initially why God had left her, not let her die. As time went on, that morphed into maybe God left me here for a reason, to perhaps memorialize my children. But all her conversations had this theme of this is what God wants me to do." Additionally, the defendant exhibited symptoms of paranoia, believing that a nurse "was a voodoo priestess . . . [who] was going to poison her" and that, "when other patients touched her . . . they were transmitting spirits to her." The defendant's symptoms improved significantly with antipsychotic medication but never "went away completely" because she still believed that "this was how God wanted her to be or [that] this is what God would have wanted . . . ."

Amble interviewed the defendant "a total of ten times" and attempted to corroborate the defendant's self-reporting through other sources, such as police reports, medical records, Department of Children and Families (DCF) records, and interviews with the defendant's friends and family. The defendant's version of events, as reported to Amble, was admitted into evidence through Amble's written report and in-court testimony. According to Amble, the defendant "began to specifically plan for the ending of her children's [lives] three days prior to the . . . offense, [but] she had been contemplating her own death for several months. She linked her suicidal intent not only to numerous mount-

ing stressors in her life, but also to a belief that such a plan was ordained by God, and, as new conflicts and stressors arose, this simply gave her confirmation of God's plan.[9]

* * *

"On Thursday, May 28, [the defendant's] children were scheduled to go to school. She had not specifically planned to end her children's lives that day but felt that her fate was likely to arrive soon, so she decided to spend the entire day with them, doing things they enjoyed. She let her children sleep until about 10 [a.m.] She did not contact the school to let them know the children were not going in, having an underlying thought that perhaps this would be their last day alive. When they woke, they were given breakfast and spent the rest of the morning and into the afternoon watching movies . . . . They prepared lunch together and generally had an enjoyable day. She then brought them out to collect their dinner, which was a take-out meal from McDonald's. . . . They then went to the nearby Wal-Mart in East Haven, where she allowed her kids to buy a treat for dessert . . . and nail polish.

"It was at the McDonald's [restaurant] when [the defendant] conceived of the method to end her children's [lives]. She decided that the children had not yet been baptized and felt that to drown them would accomplish their death and salvation. She did not know how to accomplish this until walking through Wal-Mart, when the idea came to her to purchase sleeping medications in order to sedate them. She went to the pharmacy section and purchased a package of Wal-Mart brand sleep aids, [ZzzQuil], and either Aleve or Advil PM. . . . She said, 'I didn't want the kids to be scared. I wanted them relaxed and sweet.' . . .

"Upon their return [home], the children ate their meals while watching another movie . . . . Following the meal, the children had their treat from Wal-Mart. [The defendant] then took out all the pills from the blister pack of Wal-Mart brand sleeping medication, which contain[ed] [twenty-four] pills, and gave each child [twelve] pills telling them they were simply medication they needed to take. The medication pills were chewable, and the children ate them immediately upon their mother's instruction. . . .

"While the movie was playing, [the defendant] drew a bath for her daughter in the downstairs bathtub. Feeling that enough time had elapsed for her daughter to become drowsy, she called her down to the bathroom. Her daughter came, and they said the Lord's Prayer together. [A] then undressed and got into the tub. [The defendant] told her daughter she loved her and told her to sit back so she could wash her hair. [The defendant] said her daughter was visibly sedated with the medication." (Footnote added.) The defendant told her daugh-

ter "how much [she] loved her" and "held her [head] underwater . . . until she could see a look in her eye that suggested [A] was no longer alive."

"[The defendant] then picked her daughter up from the tub and brought her into her bedroom on the first floor, dried her off and dressed her in her favorite dress. With her daughter lying there, she returned to the bathroom, let out the rest of the water from the tub and drew a new bath for her son. She then called for her son, but he was too sedated to bring himself to the bathroom. She went and assisted him, seeing that he was, 'heavily medicated.' In the same manner, she said the Lord's Prayer with her son" and held his head underwater for "approximately [one] minute" until she "was convinced her son was also dead." She dressed her son and then dragged both children's bodies into the living room, where she positioned them "with their heads near each other, their arms to their side[s], holding hands."

The defendant cleaned up the house and then used a disposable razor to "deeply cut her wrists. . . . With her arms bleeding profusely, she laid down with her head by the children's feet and her feet up by . . . their heads. She draped her arms over her children's legs and passed out."

The next day, the defendant awoke and "realized she had not died." She then wrote the suicide note found at the feet of the children's bodies, as well as the letter to Santiago. The defendant's recollection of "the rest of her time in the house 'was fuzzy,'" but she spent the next few days before she was found on June 2, attempting to kill herself by cutting her wrists, overdosing on medication, and turning on the gas in the home.

Amble testified that, in his expert opinion, the defendant was suffering from a mental disease or defect at the time she killed D and A, specifically, psychosis, which is characterized by "[h]allucinations, delusions, disorganized thinking, disorganized conduct, [and] flattened affect."[10] Amble opined that, due to her psychosis, the defendant had developed "a 'religious delusion,'" which he defined as a "'fixed false belief,'" "that killing her children and herself was 'God's plan.'" "Nevertheless . . . Amble stated that this 'religious delusion' did not prevent [the defendant] from being able to engage in deception" or conduct "'independent from' the psychosis," such as writing a "well organized," "clear," "succinct," and "logical" suicide note. In Amble's opinion, at the time she killed D and A, the defendant "didn't appreciate what she was doing was wrong, and she wasn't able to rationally control her conduct in accordance with the law."

On cross-examination, Amble conceded that, prior to the murders, none of the defendant's friends, family, or coworkers noticed the defendant engaging in any

psychotic behavior, exhibiting any religious delusions, or focusing on religious matters, such as quoting the Bible or talking about God. Indeed, at trial, the defendant's sister testified that she spent approximately two hours with the defendant on the afternoon of May 25, 2015, and the defendant appeared "upbeat" and was "jok[ing] and laugh[ing] as usual." Amble also admitted that some of the defendant's communications at or around the time of the murders were not consonant with the existence of a religious delusion. For example, Amble "[did not] know" why the defendant would text her mother that she did not "want or deserve a service," if she was "utterly convinced that this was God's plan." Additionally, Amble acknowledged that, if the defendant truly was suffering from a fixed false belief that she "was carrying out God's plan," then she "wouldn't, at least in her [own] mind" burn for eternity, despite the statement in her suicide note, "if I burn for eternity at least I'll know why I deserve it." Amble observed that the defendant's suicide note reflected "some confusion in her thinking about whether this was the right thing."[11]

Although Amble interviewed the defendant multiple times in 2015 and 2016, she did not inform him until a few months before trial, on October 17, 2018, that she actually "hear[d] the voice of God prior to the [murders] . . . saying, '[i]t's time to come home.' She said the voice was clear and sounded as though someone [was] sitting in the seat next to her." Amble acknowledged that there is a distinction between interpreting the will of God and having auditory hallucinations of God's voice, and that the defendant's failure to inform him previously of this "important . . . psychotic symptom" was a "significant omission . . . ." Nonetheless, Amble continued "to hold the opinion that, at the time of the . . . offense, [the defendant's] actions were the product of her delusional belief that God's will for her was to end her life and the lives of her . . . children," and that she "did not have the rational capacity to prevent her actions [or to] appreciate the wrongfulness of her conduct at the time she ended their lives."

To rebut the defendant's insanity defense, the state proffered the expert testimony of Catherine Lewis, a board certified forensic psychiatrist. Lewis interviewed the defendant for a total of about eleven hours and reviewed various other sources of information, such as police reports, the defendant's medical records, and the defendant's DCF records. "In contrast to . . . Amble . . . Lewis opined that she did not see evidence of a 'serious' mental disease or defect," such as psychosis, "on the part of the defendant at the time of the offenses. . . . Rather . . . Lewis diagnosed the defendant with a mixed personality disorder with antisocial and borderline features.[12] Although borderline features 'can result in transient psychosis' . . . Lewis concluded that there was 'inadequate evidence' that it existed at the time of

the offenses."[13] (Footnote added.) Lewis pointed out that the defendant has "a long history of aggressive and violent behavior" and "had been evaluated many times over the years, beginning in childhood, by social workers, psychologists, and psychiatrists." Despite multiple, prior psychological evaluations, the defendant had never previously been diagnosed with a major mental illness, such as psychosis. In Lewis' expert opinion, the defendant killed her children because "she was angry and upset" at having to raise them on her own "and [was] potentially using substances and therefore disinhibited and took action on the available people," namely, D and A. Lewis believed that, at the time she killed her children, the defendant had the "ability to conform her conduct to the requirements of the law or to appreciate the wrongfulness of her conduct at the time of the alleged offenses."

Lewis explained that the defendant's suicide note was inconsistent with psychotic thinking or a religious delusion. The defendant's suicide note was "organized. It's laid out coherently. There's no evidence of a thought disorder such as perseveration. Tangentially, circumstantially, it's not there." There also was no mention of baptism; instead, according to Lewis, the suicide note reflected the defendant's hurt, anger, and appreciation of the wrongfulness of her actions. Lewis asked, "why would somebody burn for eternity for . . . ushering her children into heaven? Why would God burn someone for eternity who saved her children's souls?"

Like Amble, Lewis testified that "a delusion is a fixed, false belief." Although "[p]eople who are truly delusional do strange things," their behavior tends to "[make] sense" within the context of the delusion, and they "don't waver . . . ." With respect to the defendant, Lewis explained that "[y]ou don't just come off a delusion the way it's described in this case. It doesn't come on suddenly . . . it's just not the trajectory." In particular, "the whole baptism angle" did not "make a lot of sense to [Lewis] for a few reasons." First, the defendant herself was not baptized, and, "if you think baptism is necessary to go to heaven, and you kill your children so you can be there with them, how are you gonna be there with them if you're not baptized? It didn't make any sense." Second, "people who have religious delusions will tell [other] people about it," but the defendant's "contemporaneous texts . . . never [mention]" the defendant's religious delusions. Third, "poisoning someone isn't consistent with baptism. It's just . . . not how delusions work" because "it's not consistent to sedate people to be baptized." Lewis stated: "[I]n plain English, the story doesn't make sense. It just doesn't make sense. The baptism thing is like spurious. The story would make more sense to me if . . . [the defendant] was so overcome and overwhelmed with caring for [her] children . . . was angry . . . [and] thought [they would] all be better off in heaven [that

she] killed them with Benadryl. That would make more sense  . . . ."

On the basis of the foregoing evidence, the trial court concluded that the defendant had committed the charged offenses by "intentionally formulat[ing] a plan to kill her children, [taking] intentional and deliberate action to carry out that plan, and employ[ing] a methodology consistent with that intent and plan." With respect to the defendant's insanity defense, the court determined that "Amble's opinion that the defendant, as a result of mental disease or defect, lacked substantial capacity either to appreciate the wrongfulness of her conduct or to control her conduct within the requirements of the law was undermined by his failure to investigate, or adequately explain, evidence that is at variance with that opinion," thus "adversely affecting the reliability and credibility of his testimony." The court provided the following examples of evidence and methodological flaws that, in its view, undermined Amble's opinion: (1) the statement in the defendant's suicide note, "if I burn for eternity at least I'll know why I deserve it," which the court said exhibited an "obvious appreciation by the defendant of the wrongfulness of her conduct," (2) Amble's failure to ask the defendant why she wrote the suicide note or for whom it was intended, (3) Amble's failure "to explain adequately, to the satisfaction of the [court]," how the defendant's text messages were "consistent with a psychosis or 'religious delusion,' " (4) the defendant's suicide note contained an "impassioned and remonstrating" "diatribe against [M], the children's father," which the court found to be inconsistent with a " 'religious delusion,' " (5) Amble's failure to ask the defendant if she believed suicide is a sin, why she needed to medicate the children to baptize them, and why there was alcohol in A's system at the time of her death, (6) the belated timing of the defendant's revelation that she heard the voice of God before the murders "adversely impact[ed] its credibility, especially given its proximity to the start of trial," and (7) the inconsistency between Amble's opinion and Santiago's statements to Amble that there were no "apparent signs of a psychosis, hallucinations, 'religious delusions,' or loss of cognitive functioning" prior to the murders.

In light of the other evidence adduced at trial, including, but not limited to, Lewis' expert testimony, the autopsy report, and the evidence of the defendant's demeanor and state of mind around the time of the murders, the trial court was "not convinced the 'baptism' narrative self-reported by the defendant actually occurred." The court was "not persuaded that the children were in fact drowned," and, even if they were, "it is clear that they were given lethal amounts of medication and were poisoned. . . . Poisoning someone is not consistent with 'baptism.' " The court also found the following relevant evidence to be inconsistent with the

defendant's baptism narrative and the existence of a religious delusion at the time of the murders: (1) the defendant herself was not baptized, and it was "unclear how [she] would join [her children] in heaven," (2) "[t]he defendant never mentioned baptism, or any remotely 'religious delusion,' in her confession and 'suicide' note, text messages or conversations immediately before or after the crimes," (3) the defendant spent "hours researching how to kill [D and A] with medication" and drafted text messages that exhibited her "appreciation of the wrongfulness of her conduct," saying that she was " 'sorry' " and did not "deserve a service," (4) the absence of evidence of any hallucinations "at the time of the offense," and (5) "[t]he deception and falsehoods propagated by the defendant in contemporaneous text messages and phone conversations . . . ." Accordingly, the court found that "[t]he defendant . . . failed to satisfy her burden of proving that, as a result of mental disease or defect, she lacked substantial capacity to appreciate the wrongfulness of her conduct or to control her conduct within the requirements of the law."

The defendant filed a motion for a judgment of acquittal; see Practice Book § 42-53 (b); claiming that no rational fact finder reasonably could reject her insanity defense. Alternatively, the defendant asked the court to set aside the verdict and to order a new trial, claiming that its "rejection of the defense of lack of capacity under . . . § 53a-13 is against the weight of the evidence . . . ." The court denied the defendant's motions and sentenced the defendant to consecutive terms of 60 years of incarceration on each count of murder, for a total effective sentence of 120 years' incarceration. This appeal followed.[14]

Our review is governed by the following principles, most recently articulated by this court in *State* v. *Weathers*, 339 Conn. 187, 260 A.3d 440 (2021). Importantly, insanity is an affirmative defense, which means that the defendant bore the burden of proving legal insanity by a preponderance of the evidence. Id., 209. The insanity defense "has both a cognitive and a volitional prong. . . . Under the cognitive prong . . . a person is considered legally insane if, as a result of mental disease or defect, [she] lacks substantial capacity . . . to appreciate the . . . [wrongfulness] of [her] conduct. . . . Under the volitional prong, a person also would be considered legally insane if [she] lacks substantial capacity . . . to conform [her] conduct to the requirements of law." (Citation omitted; internal quotation marks omitted.) *State* v. *Madigosky*, 291 Conn. 28, 39, 966 A.2d 730 (2009). The present case was decided by a three judge court instead of a jury, but, nonetheless, "the burden is on the defendant to prove [her] affirmative defense, the normal rules for appellate review of factual determinations apply and the evidence must be given a construction most favorable to sustaining the

court's verdict." (Internal quotation marks omitted.) *State* v. *Weathers*, supra, 209.

"Undoubtedly, [o]pinion testimony from psychiatrists, psychologists, and other [mental health] experts is central to a determination of insanity. . . . Through examinations, interviews, and other sources, these experts gather facts from which they draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior. . . . At trial, they offer opinions about how the defendant's mental condition might have affected [her] behavior at the time in question. . . . Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, [mental health] experts can identify the elusive and often deceptive symptoms of insanity and tell the [trier of fact] why their observations are relevant. . . . In short, their goal is to assist [fact finders], who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense." (Internal quotation marks omitted.) Id., 210.

Equally well settled are the rules governing the permissible use of expert testimony at trial. The trier of fact "can disbelieve any or all of the evidence on insanity and can construe that evidence in a manner different from the parties' assertions. . . . It is the trier of fact's function to consider, sift and weigh all the evidence including a determination as to whether any opinions given concerning the defendant's sanity were undercut or attenuated under all the circumstances." (Citation omitted; internal quotation marks omitted.) Id., 211. The trier of fact "is not bound to accept a defense expert's opinion on insanity," even when the expert testimony adduced at trial is conflicting or "the state has presented no rebuttal expert." Id., 210; see also *State* v. *Quinet*, 253 Conn. 392, 407, 752 A.2d 490 (2000) ("[t]he evaluation of [conflicting testimony] on the issue of legal insanity is the province of the finder of fact" (internal quotation marks omitted)). "The credibility of expert witnesses and the weight to be given to their testimony . . . on the issue of sanity [are] determined by the trier of fact. . . . [I]n its consideration of the testimony of an expert witness, the [trier of fact] might weigh, as it sees fit, the expert's expertise, his opportunity to observe the defendant and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions [that] he drew from them." (Citation omitted; internal quotation marks omitted.) *State* v. *Weathers*, supra, 339 Conn. 210–11.

There are limits, however, on the permissible use of expert testimony. As we explained in *Weathers*, "[t]he trier's freedom to discount or reject expert testimony does not . . . allow it to *arbitrarily* disregard, disbe-

lieve or reject an expert's testimony in the first instance. . . . [When] the [trier] rejects the testimony of [an] . . . expert, there must be some basis in the record to support the conclusion that the evidence of the [expert witness] is unworthy of belief." (Emphasis in original; internal quotation marks omitted.) Id., 211–12. That said, "given the myriad bases on which the trier properly may reject expert testimony and the reviewing court's obligation to construe all of the evidence in the light most favorable to sustaining the trier's verdict, it would be the rare case in which the reviewing court could conclude that the trier's rejection of the expert testimony was arbitrary." Id., 212–13.

In the present case, after carefully reviewing the evidence adduced at trial in the light most favorable to sustaining the court's verdict, we conclude that the court did not arbitrarily reject Amble's expert testimony. Amble's expert opinion directly conflicted with the state's expert's opinion. The psychiatrist called by the state, Lewis, testified that, at the time the defendant committed the murders, she was not suffering from a mental disease or defect, was able to appreciate the wrongfulness of her conduct, and was able to conform her conduct to the requirements of the law. Lewis opined that the defendant's self-reported version of events—that she had drowned D and A while in the grip of a psychotic, religious delusion—was unsupported and contradicted by numerous other facts, including the defendant's prior psychiatric history and her behavior and communications during the critical time period from May 27 to June 2, 2015. Lewis described the defendant's behavior and communications during this time as "organized . . . and focused on the earthly." For example, the defendant's online activity, such as her Internet searches on how to poison her children and her purchasing and printing a "Click-N-Ship" label to mail a letter to Santiago, reflected "organized thought" and "multistep" planning inconsistent with psychotic behavior. Lewis described the defendant's suicide note as "well typed," "organized," "linear," "coherent", "goal directed," and "stunning[ly]" devoid of any "mention of baptism." Similarly, the defendant's text messages to her family, coworkers and friends were not "overtly psychotic" and did not mention God or baptism.

According to Lewis, the manner in which the defendant committed the murders also was inconsistent with her alleged religious delusion. Lewis pointed out that "it's not consistent to sedate people to be baptized" and that, because the defendant herself was not baptized, it was "internally discordant" to baptize D and A in order "to be with [them]" in death. Additionally, in Lewis' view, the defendant's statement in her suicide note, "if I burn for eternity at least I'll know why I deserved it," was inconsistent with a religious delusion because God would not "burn someone for eternity who saved her children's souls . . . ." Lewis also testi-

fied that the defendant's text message to her mother, "I love you and I'm sorry," was inconsistent with a fixed religious delusion because, "why would [the defendant] be sorry for having [her] children go to heaven?" Lewis opined that these communications not only were inconsistent with a religious delusion but affirmatively reflected the defendant's "[a]ppreciation of [the] wrongfulness" of her actions.

Given the directly conflicting expert testimony, the trier of fact was free to credit Lewis' expert opinion and to reject Amble's expert opinion. For better or worse, the success of much litigation, in both criminal and civil cases, depends on the credibility and effect of expert testimony on the trier of fact. We repeatedly have observed that, "[w]hen experts' opinions conflict . . . [i]t is the province of the [trier of fact] to weigh the evidence and determine the credibility and the effect of testimony . . . . [T]he [fact finder] is free to accept or reject each expert's opinion in whole or in part." (Internal quotation marks omitted.) *Grondin* v. *Curi*, 262 Conn. 637, 657 n.20, 817 A.2d 61 (2003). In the present case, the expert opinions regarding the defendant's sanity at the time of the commission of the murders were conflicting, and it was up to the court to determine which expert opinion, if either, it credited.

Even if we set the conflicting expert testimony aside, Amble's expert opinion was undermined by the other evidence adduced at trial. The defendant's sister, best friend, oldest son, and daycare provider all testified that they had communicated and/or interacted with the defendant in the days immediately before or after the murders and that the defendant exhibited no symptoms of psychosis or religious delusion. See *State* v. *Weathers*, supra, 339 Conn. 217–18 (recognizing that defendant's "conduct and demeanor shortly before or after the crime are relevant, and no doubt necessary, to making [an insanity] determination" and "may be more indicative of actual mental health at [the] time of the crime than mental exams conducted weeks or months later" (internal quotation marks omitted)). Similarly, the data extracted from the defendant's cell phone, which included her contemporaneous text messages and Internet searches, did not exhibit a preoccupation with or focus on the divine. The autopsy reports and the testimony of the state's medical examiner, which established that the causes of death of D and A were not drowning, as the defendant had reported, but acute drug and/or alcohol intoxication, also were inconsistent with Amble's expert opinion that the defendant had drowned her children while in the midst of a religious delusion.

The trial court also was entitled to find that the state effectively had undermined Amble's testimony on cross-examination. See, e.g., *State* v. *Cobb*, 251 Conn. 285, 490, 743 A.2d 1 (1999) ("the state can weaken the force

of the defendant's presentation by cross-examination and by pointing to inconsistencies in the evidence" (internal quotation marks omitted)), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). On cross-examination, Amble could not explain to the court's satisfaction why the defendant would text her mother that she did not "want or deserve a service" if she was "utterly convinced that this was God's plan." Amble also had significant difficulty explaining the statement in the defendant's suicide note about burning for eternity, admitting that, if the defendant genuinely believed that she "was carrying out God's plan," then she "wouldn't, at least in her [own] mind," burn for eternity. Additionally, Amble admitted that there was no evidence to corroborate the defendant's self-reported symptoms of psychosis prior to the murders and that the trauma of killing her own children and remaining in the home by herself for days with their decomposing bodies could have induced the defendant's subsequent psychosis. See footnote 13 of this opinion.

In a case involving conflicting evidence, "it is the quintessential [fact finder] function to reject or accept certain evidence, and to believe or disbelieve any expert testimony." (Internal quotation marks omitted.) *State* v. *Crespo*, 246 Conn. 665, 679, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999). On the present factual record, "[t]he [fact finder] was free to reject, in whole or in part, the expert defense testimony, and to credit the state's [expert testimony] . . . ." *State* v. *Medina*, 228 Conn. 281, 310, 636 A.2d 351 (1994); see also *State* v. *DeJesus*, 236 Conn. 189, 201, 672 A.2d 488 (1996) ("[i]t is well settled that the trier of fact can disbelieve any or all of the evidence proffered concerning the defense of insanity, including expert testimony, and can construe such evidence in a manner different from the parties' assertions"); *State* v. *Gray*, 221 Conn. 713, 720, 607 A.2d 391 ("[i]n finding facts in cases of conflicting expert testimony, a [fact finder] may choose to believe one expert over another"), cert. denied, 506 U.S. 872, 113 S. Ct. 207, 121 L. Ed. 2d 148 (1992). In light of the foregoing evidence, we conclude that the court reasonably rejected the defendant's insanity defense.

The defendant contends that no rational fact finder could have credited Lewis' expert testimony and rejected Amble's expert testimony because Lewis reviewed the same materials as Amble but conducted fewer collateral interviews and spent less time interviewing the defendant.[15] This claim is without merit. It is axiomatic that "[t]he credibility of expert witnesses and the weight to be given to their testimony . . . on the issue of sanity is determined by the trier of fact." (Internal quotation marks omitted.) *State* v. *Medina*, supra, 228 Conn. 309. "We will not . . . substitute our judgment for that of the fact finder with respect to the weight to be given the testimony of the expert . . .

witnesses on the issue of the defendant's sanity." *State v. Patterson*, 229 Conn. 328, 340, 641 A.2d 123 (1994). As we previously explained, the trier of fact reasonably credited Lewis' expert testimony that, at the time the defendant murdered D and A, she was not suffering from a mental disease or defect, was able to appreciate the wrongfulness of her conduct, and was able to conform her conduct to the requirements of law. Accordingly, we affirm the judgment of conviction.

The judgment is affirmed.

In this opinion the other justices concurred.

* In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

** September 13, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 53a-13 (a) provides that, "[i]n any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

[2] M is the defendant's ex-husband and the father of D and A.

[3] J is M's daughter from a prior relationship.

[4] D.W. is the defendant's son from a prior relationship. D.W. was seventeen years old and living with his father at the time of the murders.

[5] N is the defendant's daughter from a prior relationship. The defendant's parental rights to N were terminated in 2008. N was thirteen years old and in the custody of the Department of Children and Families at the time of the murders.

[6] D.J. is the defendant's son from a prior relationship. The defendant's parental rights to D.J. were terminated in 2008. D.J. was ten years old and had been adopted by his foster family at the time of the murders.

[7] Many of defendant's text messages during the relevant time period were delayed or deleted, and, as a result, the "date and time on such messages are likely when they were placed in [a temporary file pending future action] and not when they were actually created." (Internal quotation marks omitted.)

[8] Alternatively, the defendant raised the affirmative defense of extreme emotional disturbance pursuant to General Statutes §§ 53a-54a (a) and 53a-55 (a) (2). The trial court rejected this defense, finding that "the defendant . . . failed to prove by a preponderance of the evidence that she caused the death of her children while under the influence of an extreme emotional disturbance, for which there was a reasonable explanation or excuse measured from the view point of a reasonable person in the defendant's situation under the circumstances as she believed them to be." The defendant does not challenge this finding on appeal.

[9] These conflicts and stressors included (1) a physical altercation with M, which led to the defendant's arrest, (2) the arrest of the defendant's oldest son, D.W., (3) the diagnosis of the defendant's youngest son, D, "as a 'special needs child,' " (4) the loss of a babysitter "loved" by D and A, (5) the placement of the defendant's oldest daughter, N, for adoption, (6) the "recent loss of a relationship," and (7) the defendant's upcoming thirty-sixth birthday and her feeling that "she had not had any significant or meaningful accomplishments."

[10] At trial, Amble testified that, in his opinion, the defendant had developed schizoaffective disorder "in the days or so before she took her children's [lives]," which had persisted up to and including the time of trial. In his first written report, however, Amble expressed his opinion that, although he did not disagree with a diagnosis of schizoaffective disorder, the defendant's symptoms at the time of the murders also were "consistent with a [m]ajor [d]epression with [p]sychotic [f]eatures." Amble based "[t]his assessment . . . on the defendant's symptoms at the time of the . . . offense including a depressed mood, anhedonia, hopelessness, insomnia, and persistent suicidal ideation."

[11] Amble explained that, when the defendant woke up following her suicide

attempt and realized she had not died, she started "questioning what in the heck is going on here. . . . I have followed God's plan. This is what I was supposed to do, and suddenly she is now not dead, and she can't believe it, that she's not dead, and wonders at some point whether she even heard this message right to begin with."

[12] In her written report, Lewis defined a "[p]ersonality [d]isorder [as] a pervasive and enduring pattern of behavior that differs markedly from expectations of an individual's culture and includes difficulties in ways of perceiving self/others or events, range/intensity/lability/appropriateness of emotional response; interpersonal functioning, and impulse control. These difficulties occur across a broad range of personal and social situations. There is significant impairment."

[13] In her written report, Lewis stated: "People diagnosed with [m]ixed [p]ersonality [d]isorder with [b]orderline [f]eatures can decompensate under stress and have psychotic symptoms. It is my opinion that, following her arrests, [the defendant] had a several day period [during which] she was shocked and traumatized [by] what had occurred. She exhibited signs of complex bereavement including hearing her child's voice, paranoid ideation, and numbness. She did not have these symptoms before the alleged offense. It is my opinion that symptoms resulted from the trauma of killing her children and the consequences of so doing."

[14] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

[15] The defendant also argues that the court arbitrarily rejected Amble's expert testimony, in pertinent part, because (1) it focused "myopically" on a single sentence in the defendant's suicide note, "if I burn for eternity at least I'll know why I deserve it," divorced from "the context of the entire letter," (2) the defendant's statement about burning for eternity reflected her "acknowledgment that her actions are objectively wrought with societal disapproval for a criminal act" but do not reflect her "appreciation for the wrongfulness of her conduct," (3) Amble's expert opinion was supported by the defendant's psychiatric records at YPI and YCI, as well as Carvalho's testimony, (4) Amble "repeatedly and consistently" explained that an individual experiencing a psychotic delusion does not lose " 'cognitive functioning' " and can continue with " 'goal directed behavior toward rational things' " independent of the psychotic delusion, (5) it improperly focused on Amble's failure to investigate unanswered questions, such as why the defendant's children would be afraid of baptism and in need of medication to participate, even though Amble testified that the answers to those questions would not change his expert opinion, and (6) it incorrectly concluded that the timing of the defendant's disclosure to Amble about hearing the voice of God adversely impacted the credibility and reliability of his opinion. We reject each of these arguments for the following, respective reasons: (1) the court's memorandum of decision reflects that the court considered the entirety of the defendant's suicide note, which was devoid of any mention of baptism and included an "impassioned and remonstrating" "diatribe" against M, (2) the defendant's statement about burning for eternity patently refers to God's eternal judgment for a wrongful and immoral act rather than societal disapprobation of criminal conduct, (3) the defendant's psychiatric records at YPI and YCI, as well as Carvalho's testimony, do not address the defendant's psychiatric condition at the time of her commission of the murders, (4) the court was entitled to disbelieve Amble's testimony that the defendant's contemporaneous text messages were independent of her religious delusion and to believe Lewis' expert testimony that they were inconsistent with the existence of a religious delusion, (5) although the answers to the court's questions would not have affected Amble's expert opinion, they were critical to Lewis' expert opinion and, therefore, entitled to be weighed by the court in making its credibility determination, and (6) despite the existence of evidence indicating that the defendant heard the voice of God *after* her commission of the murders, there was no evidence, until October, 2018, on the eve of trial, that she heard the voice of God *prior to* her commission of the murders, which Amble himself admitted was a "significant omission . . . ."